Argued May 28, reversed and dismissed June 22, 1915.

## BLACK *v.* IRVIN.*

### (149 Pac. 540.)

**Exchange of Property—Rescission—Burden of Proof.**

1. Plaintiff, who alleged that defendant made misrepresentations
in effecting an exchange of property, has the burden of proof.

[As to difference between exchange of property and sale, see
note in 94 Am. St. Rep. 227.]

**Exchange of Property—Misrepresentations—Right to Rely on.**

2. A statement that a restaurant, for which plaintiff was induced
to exchange his farm, was a good place and profitable, is not a state-
ment of a positive fact on which plaintiff was entitled to rely.

**Fraud—Presumptions.**

3. Fraud cannot be presumed, but must be alleged and established
by the greater weight of the evidence.

---

*As to whether statement of opinion, such as puffing and trade
talks, etc., is fraud, see note in 35 L. R. A. 417.          REPORTER.

Exchange of Property—Fraud—Misrepresentations.
    4.  In exchange of property, statements which are mere boosting or puffing cannot be the basis of an action for fraud or rescission.
        [As to liability of vendor of realty for false representations innocently made, see note in Ann. Cas. 1913C, 63.]

From Marion: WILLIAM GALLOWAY, Judge.

Department 2.    Statement by MR. JUSTICE BURNETT.

This is a suit by William Black and wife against William A. Irvin to rescind a sale upon the ground of fraud. The transaction consisted of an exchange of a farm owned by plaintiffs, William Black and Dora Black, his wife, located about six miles from Silverton, in Marion County, Oregon, for a restaurant and lodging-house, known as the Elite Café, owned by defendant William A. Irvin, situated in the City of Salem. The complaint alleges, in substance, that the negotiations for the exchange commenced about December 24, 1913; that "for the purpose of inducing said plaintiffs to purchase said restaurant, lunch-counter, and rooming-house and to convey said above-described real premises to him, for the purpose of cheating, wronging and defrauding said plaintiffs, said defendant knowingly, falsely and fraudulently stated and represented to said plaintiffs that the expenses of operating said restaurant per day were not greater than $30, and that the receipts from said lodging-house, lunch-counter and said restaurant were and had been during the last year averaging better than $3,500 per month, and, for the purpose of convincing said plaintiffs of the truth of said statements, falsely and fraudulently exhibited certain false and fraudulent papers, representing them to be the cash receipts, as shown from the cash register, verifying said statement aforesaid"; that the business "was a good money-maker and on a good paying basis"; that plaintiffs

having no other knowledge or means of knowledge as to the truth of the statements, and, believing them to be true, executed and delivered to the defendant a warranty deed to their 104-acre farm, receiving a bill of sale of the restaurant, lunch-counter, and rooming-house, and entering into possession thereof on January 1, 1914. They allege that the above representations were false and known to be so by the defendant at the time; that they discovered the falsity thereof on January 9, 1914. According to their allegations, the business was not, and had not been for a long time past, taking in enough money to pay the running expenses. They notified the defendant that they rescinded the sale and tendered to him the restaurant and equipment, demanding a reconveyance of the land. They assert that the land was valued at $7,500, and that the restaurant and lodging-house property was of no greater value than $1,810.25.

By his answer defendant denies any fraudulent representations, and alleges that plaintiffs relied upon their own knowledge and information concerning his property and business, as well as that derived from third parties.

The reply put in issue the new matter of the answer. The Circuit Court heard the evidence, found that the land conveyed was of the value of $7,000, the restaurant property $2,000, and that defendant falsely represented the value of the restaurant, and that the same was a good money-maker and upon a paying basis, all of which plaintiffs believed. It rendered a decree in favor of plaintiffs annuling the contract. From this decree the defendant appeals.

REVERSED AND DISMISSED.

For appellant there was a brief with oral arguments by *Mr. John A. Carson* and *Mr. Thomas Brown.*

For respondents there was a brief over the names of *Mr. Frank Holmes, Mr. John H. McNary, Messrs. Smith & Shields* and *Mr. M. W. Hunt,* with oral arguments by *Mr. Holmes* and *Mr. McNary.*

MR. JUSTICE BEAN delivered the opinion of the court.

It appears that Irvin bought the property at a bankrupt sale about five years before the trade and built up a paying business, putting a large part of what he received into improvements, among which were an ice and cold storage plant and a lighting plant costing about $2,000. A short time after the exchange of the properties, the plaintiffs, being dissatisfied, obtained from dealers in second-hand goods a "rough" estimate of the value of the restaurant and lodging-house property, which valuation was placed at about $2,100. It may be considered that this was probably a very low figure, about one half the value of the properties compared with what they were worth while the café and house were a going concern. We may also concede that the plaintiffs paid a high price for them in the exchange.

It should be noted at the outset that the representations made by the defendant as to the volume of business transacted by him in the café and lodging-house pertained to the past, and that there was no warranty nor representation as to what the future earnings of the establishment would be. The evidence fails to substantiate the allegations of the complaint as to the fraudulent representations made by the defendant. There are over 450 pages of typewritten testimony in the record, much of which is devoted to describing the

paraphernalia of the restaurant and lodging-house and detailing the imperfections in the crockery, silver plate, cooking utensils, furniture, bedding, etc. This testimony could have been obtained before the exchange of the properties as well as afterward. Black examined the café and lodging-house and visited the place three or four times, remaining there nights. He evidently had a full and fair opportunity to discover the defects which he now details and attempts to describe by volumes of testimony. He failed to have his wife make an inspection of the property, and was content to rely upon his own judgment. He apparently considered that he could conduct the business as successfully as the former owner, having had experience in that line. His attempt to do so has a bearing on the case. We mention briefly that he made a test for nine days, before complaining, and conducted the restaurant until about February 1st, when, after advertising for the patronage of theater parties, he closed the same at 8 o'clock P. M. Formerly it had been open during the night. After conducting the concern until February 10th, he closed the same and notified the defendant. There is no indication that, during the short time Black was making a test of the business, any considerable new trade was attracted. It seems that, on account of a rise in the price of food and not very sumptuous repasts being served, some of the regular customers ceased to patronize the café. It was soon after the holiday season, and general business appears to have been quiet. It may well be questioned whether Black gave the business a fair trial under the transformed conditions. The capital city had recently, on November 30, 1913, inaugurated a no-saloon policy. The cafe had been located next to a beer saloon, and,

being closely connected therewith, had served liquors with meals to those who desired. During the city campaign some prejudices were accentuated, and the café seemed to lose the "wet" trade without immediately picking up much "dry" patronage. So much for the history of the conditions.

1-4. On December 15, 1913, Black wrote to a real estate firm in Salem, giving a description of his farm, and stating that he would take a good restaurant in part payment, saying:

"I am familiar with the restaurant business, and there is nobody can hand me anything on a restaurant or hotel deal, * * because I have had a lifetime at the business."

This is not noted as an excuse for any fraud on the part of the vendor but as tending to indicate that the parties were "dealing at arm's-length." The main thing that Black required of Irvin during the negotiations was a statement of what the volume of his business had been during the past year. This Irvin furnished him, and this he alleges to be false. The laboring oar is upon plaintiff to prove the incorrectness of the statement. In this respect he has failed. On the other hand, the evidence of the defendant fairly shows that the receipts of the concern during 1913 were as represented. Irvin did not keep a complete set of account-books, but made a showing before the deal as to the receipts of the business for the year 1913, of the following figures, which were taken from the cash register slips: January, $4,005.45; February, $3,621.25; March, $3,129.80; April, $2,962.35; May, $3,105.69; June, $2,984.20; July, $3,491.55; August, $3,287.25; September, $5,055.10; October, $5,571.75; November, $3,018.10; December to 25, $2,213.80.

These figures Irvin swears correctly represented the monthly cash receipts for 1913, and his evidence is not successfully refuted. To prove that this statement was fraudulent, plaintiff Black introduced evidence tending to show that, during the first month of his administration of affairs, the income was less than as represented by defendant, and produced the testimony of several of the waitresses, waiters, cooks and of the cash register girl to the effect that in their judgment the receipts were as large as when Irvin was in charge. This was an unsatisfactory estimate. The evidence tends to show that there was a decrease in the volume of business beginning in December; that it fell off 8 or 10 per cent after the city went "dry." The figures that Irvin furnished to the plaintiffs show a decrease in the month of December, and Black had an opportunity to observe the same. As stated, there is no allegation in the complaint that defendant represented that the earning capacity of the place would be any certain amount in the future. Even if this could be considered material, see *Markel* v. *Moudy,* 11 Neb. 213 (7 N. W. 853). Black, having had some experience in the hotel business at different times in small cities, was evidently willing to take his chances as to the business in the future. His figures of the income for the time he conducted the establishment are as follows: Cash receipts for January, $1,784.85; expenses, $2-137.09; first ten days in February, cash receipts, $443.50; expenses, $556.21. The decrease in the volume of trade during Black's administration does not prove that the receipts of the business during the year were not as asserted by Irvin. It is in evidence that one man may make a success of the restaurant business while another a complete failure. That the place

was a "money-maker" during the time Irvin managed it was fairly shown by the evidence. This, however, is a general statement which was added to Irvin's written showing by a real estate dealer, who acted between the parties in negotiating the transfer, and it amounts to no more than "boosting a trade" or saying it was a good place. Referring to this statement in his evidence, Black says, "We were going a good deal on that." It was not a statement of a positive fact upon which Black had a right to rely: *Fellows* v. *Evans,* 33 Or. 30 (53 Pac. 491). There was no attempt, on the part of plaintiffs, to directly prove the falsity of Irvin's statement as to the cash receipts. Some of the employees merely stated opinions, and they did not agree in their conclusions.

Fraud cannot be presumed. It must be alleged and established by the greater weight of the evidence: *Keel* v. *Levy,* 19 Or. 450 (24 Pac. 253); *Scott* v. *White,* 50 Or. 111 (91 Pac. 487); *Allison* v. *Ward,* 63 Mich. 128, (29 N. W. 528). A list of the goods was made, and Black had an opportunity, before the deal, to obtain information in regard to their value. He was in a better position to do this before the deal than were the courts afterward. In *Scott* v. *Walton,* 32 Or. 460, at 461 and 462 (52 Pac. 180, at 181), former Mr. Justice BEAN states the well-known rule as follows:

"The evidence shows that the negotiations between the parties for the exchange continued some 10 or 15 days before the trade was finally consummated; that plaintiff resides near Lebanon and was acquainted with the property defendant was offering to trade to him, and that he not only had a full opportunity to, but did actually, examine it before making the exchange. Under such circumstances, the mere statement of the defendant as to its value furnishes no ground for avoiding the contract. The law recognizes

the well-known fact that it is characteristic of human nature for the owner, when about to sell his property, to set a high value thereon for the purpose of enhancing it in the buyer's estimation; and hence, when the parties are dealing at arm's-length, it does not help a purchaser who accepts and relies upon the vendor's statements as to value, when no warranty is intended and when the language used is not an affirmation of some specific fact, but the mere expression of opinion.''

See, also, *Collins* v. *Jackson,* 54 Mich. 186 (19 N. W. 947).

It is stated in 14 Am. & Eng. Ency. of Law (2 ed.), page 118:

''The doctrine is that, when persons are dealing at arm's-length and on equal terms, mere commendatory expressions as to value, quality, prospects and the like, though exaggerated, cannot be made the basis of a charge of fraud, if there is no representation or concealment of any material fact, and nothing is said or done to prevent the other party from making an examination or investigation for himself.''

The true rule is that a fraudulent misrepresentation cannot itself be the mere expression of an opinion of the person making it. While the vendee has a right to rely on an assertion of fact, he has no right to rely upon the mere expression of an opinion by the vendor in whatever language such expression is made. He is assumed to be as equally able to form his own opinion and come to a correct judgment in respect to the matter as the vendor, and cannot justly claim to have been misled by the opinion, however erroneous it may have been. For this reason the general praise of one's own property by a seller, commonly called ''puffing,'' for the purpose of enhancing it in the buyer's estimation, is always allowed, provided it is kept within reasonable limits, is not a positive affirmation

of a specific fact affecting the quality, so as to be an express warranty, and not the intentional assertion of a specific and material fact known to the party to be false, so as to be a fraudulent misrepresentation: 2 Pomeroy, Eq. Juris. (3 ed.), § 878.

*Sherman* v. *Glick,* 71 Or. 451 (142 Pac. 606), relied upon by plaintiffs, is a case where defendant grossly misrepresented the value of a house and lot to an old lady, poorly educated, and unacquainted with the property and with business, and overreached her to the amount of $1,750. This was held to be a constructive fraud. The case is not in point.

Applying the rules above stated to the issues and evidence in the case at bar, it follows that the decree of the lower court should be reversed and the suit dismissed; and it is so ordered.

REVERSED.   SUIT DISMISSED.

MR. CHIEF JUSTICE MOORE did not sit in this case, and took no part in the consideration.

MR. JUSTICE BURNETT, MR. JUSTICE EAKIN and MR. JUSTICE HARRIS concur.