Argued January 14; affirmed January 26, 1937

KILLGREEN *v.* WESTERN LOAN &
BUILDING CO.

(64 P. (2d) 526)

Department 2.

*R. W. Skulason,* of Portland (Skulason & Skulason and W. Franklin Ake, all of Portland, on the brief), for appellants.

*Ralph S. Hamilton,* of Portland (Bronaugh, Hamilton, Bynon & Bronaugh, of Portland, on the brief), for respondent.

CAMPBELL, J. On December 7, 1931, and for some time prior thereto, plaintiffs were indebted to defendant, Western Loan and Building Company, a Utah corporation, with its home office in Salt Lake City, in the sum of about $6,500, which sum was past due.

This indebtedness was secured by a mortgage on the following described real property:

"Part of the Joseph Kellogg Donation Land Claim in Township One (1) South, Range One (1) East of Willamette Meridian, bounded by a line beginning at a stake 17.37 chains North 1 degree West and 18.12 chains South 70 degrees East from the Southeast Corner of the Lot Whitcomb Donation Land Claim, which stake is in the center of the Foster & Milwaukie Road and is the Northeast corner of a tract of land now or formerly owned by John Stuckey, thence South 70 degrees East 4.545 chains to a point in the center of said road as place of beginning of tract to be described: thence still along the center of road South 70 degrees East 4.745 chains to a stake; thence South 20 degrees West 26.90 chains to the center of Kellogg Creek, thence down Creek 4.745 chains to the Southeast corner of tract heretofore granted and conveyed by Robert Glen and his wife and others to L. C. Millard; then North 20 degrees East, along side of said Millard's land 26.40 chains to the place of beginning, containing thirteen (12 acres, more or less."

On said date, in order to discharge said indebtedness and save the cost of foreclosure, plaintiffs executed and delivered a deed conveying said premises to defendant, and at the same time, as a part of said transaction, plaintiffs and defendant entered into a contract in writing. Omitting the formal parts, said contract is as follows:

"Now, THEREFORE, in consideration of the premises and for a valuable consideration by each party paid

to the other, receipt whereof is hereby acknowledged, the parties agree, stipulate and covenant as follows:

First: That the said Owners have conveyed or shall forthwith convey to the party of the Second Part, the premises above described and in consideration of such conveyance, the Party of the Second Part acknowledges full satisfaction of and releases the said mortgage and the debt secured by said mortgage and duly cancel and release the said mortgage of record to the end and purpose that the said owners shall be and are released and exonerated from all further liability upon said note and mortgage.

Second: Said conveyance shall vest the part of the Second Part with absolute, unconditional title, possession and right to possession of said premises, free and clear of all liens and encumbrances, excepting the mortgage in favor of Second Party (to be released as above set forth) and current accruing taxes shown of record; and the parties covenant that said conveyance shall not be and shall never be construed to be an equitable or any other form of mortgage or security, for and on behalf of said indebtedness, and the Owners expressly covenant not to bring or maintain any action or defense founded on the claim or theory that said conveyance is any form of security.

Third: The Second Party gives and grants to the Owners, for and during the term from date July 1, 1932, an option to purchase said property or to find a purchaser for said property (without cost or commission to Second Party) at and for a purchase price equal to the full amount of the Second Party's investment in said premises from the date of advances at the rate of 8.4 per cent per annum. Second Party will furnish a statement showing said purchase price at any time upon request. In return for the payment of such purchase net to the Party of the Second Part, it will execute and deliver to the purchaser its good and sufficient bargain and sale deed, without warranties however, excepting against its own acts, but subject to taxes. Said option must be exercised in writing accompanied by a tender of the purchase price on or before the expiration

of said lease, to-wit: before midnight of the 30th day of June, 1932. Otherwise all the rights of the Owners in and to said premises and under this agreement shall cease. The Owners shall have the right to pay not less than 15 per cent of said purchase price in cash and to pay the balance under any of the installment plans then in use by Second Party and under its regular form of contract of sale.''

Plaintiffs failed to exercise said option to purchase the premises within the time fixed therein and at about the date of the expiration of said option, entered into a further oral agreement with the defendant that said plaintiffs be permitted to remain in possession of said premises, paying the defendant $50 per month as rental therefor. Plaintiffs paid this rent for a period of five months, at which time they ceased making any further payments.

On May 17, 1933, defendant herein as plaintiff, began an action of forcible entry and detainer for the possession of said premises, and on that date filed its complaint in the circuit court for Clackamas county. On May 22, 1933, defendants therein and plaintiffs herein filed their answer to said action, consisting of a general denial. On request of defendants therein, said action was continued from time to time until July 9, 1934, on which date the case came on for hearing. Plaintiff therein appeared by its attorney and defendants by their attorney and defendant Mabel Killgreen in person. The defendants therein, in open court, withdrew their answer and consented that judgment for restitution of the premises be entered against them, and it was further consented to by attorneys for the respective parties, that execution should be stayed for a period of ninety days.

No execution was issued on said judgment and plaintiffs herein were not disturbed in the possession

of the premises until July 5, 1935, at which time the plaintiffs herein were notified in writing by defendant that if they wished to remain in possession any longer, they would have to pay a rental for said premises in the sum of $35 per month. On July 12, 1935, they filed the instant suit.

The foregoing facts are not in dispute.

In addition to the foregoing facts, plaintiffs alleged in their complaint that on or about November —, 1934, the defendant orally agreed to reconvey said premises to the plaintiffs on their payment to it of $4,000 in bonds of the Home Owners Loan Corporation and that plaintiffs remained in possession of said premises, and in reliance on said oral agreement, made valuable permanent improvements thereon in the sum of $850. These allegations were denied in defendant's answer.

The defendant, for a further and separate answer and defense, pleaded the judgment in the forcible entry and detainer action, above referred to, as bar to the suit.

The cause came on for hearing and the court entered a decree dismissing said suit, without costs to either party. From that decree, plaintiffs appeal.

In the argument before this court, plaintiffs' counsel admitted that the deed executed by plaintiffs to defendant, being of date of December 7, 1931, was an absolute and unconditional deed and not intended as or for a mortgage.

The plaintiffs rely upon the alleged oral agreement of defendant to convey to them the said premises, and attempt to avoid the provision of the statute of frauds (§ 9-909, Oregon Code 1930) by showing that they made valuable permanent improvements on said premises.

The only question presented on this appeal is whether the evidence is sufficient to establish the fact that such oral promise was made and that such improve-

ments were made by plaintiffs as would avoid the statute.

To sustain such oral promise, Mabel Killgreen testified that on the suggestion of Mr. Wilson, a representative of the Home Owners Loan Corporation, she called at the Portland office of defendant and there had a conversation with Mr. Pederson, regional manager for defendant, as follows:

"I went to Mr. Pederson's office and waited for him, and when he came in I said, 'Mr. Wilson tells me you are going to take the bonds.' He said 'Yes'. I told him the water system needed repair very badly and we had to do something with it but we didn't want to spend any money on the property if we couldn't get the loan. Mr. Pederson said: 'I will let you know in a few days.' We didn't hear anything further from him and we took it for granted we would get the loan."

On cross-examination she practically reiterated the same statement of her conversation with Mr. Pederson.

Mr. Killgreen testified:

"Q You have had no negotiation with either the HOLC or the Western Loan & Building Company yourself?

A No, sir; not myself.

Q Those negotiations have all been conducted by Mrs. Killgreen?

A Yes, sir."

In addition to this testimony Mr. Skulason, one of attorneys for plaintiffs, testified that he called up the office of defendant in Portland and had conversation with a Mr. Bauer, an employee of defendant, as follows:

"A I started to say I called up the office, and Mrs. Killgreen was there, and a gentleman, saying his name was Mr. Bauer, answered. I said to him that Mrs. Killgreen was in the office and that she said that his company had agreed to accept—

(interruptions and objections)

That the company had now decided to accept four thousand in bonds in satisfaction of the mortgage. I told him I was greatly pleased to hear it, and considerably surprised in view of my last correspondence with Mr. Pederson, and that I was very glad to hear it. He said: 'Yes, they have decided to accept four thousand dollars in bonds.' "

Mr. Pederson was called to the witness stand by plaintiffs and testified that he was regional manager of defendant for Oregon and Washington, but that he had no authority to bind defendant in adjusting differences between his employer and its mortgagors; that all matters of that nature had to be referred to Salt Lake City at the home office.

Mr. Henry Bauer was called by plaintiff and he testified that he was an employee of defendant, working out of the Portland office under the direction of Mr. Pederson; that he had no authority to make any adjustments regarding the loan made to plaintiffs by defendant; that all such matters had to be referred to the home office at Salt Lake City.

When called as a witness for defendant, Mr. Pederson testified that he had at no time agreed to accept $4,000 in HOLC bonds in satisfaction of the amount of money that defendant had invested in the property.

Mr. Bauer, as a witness for defendant, also testified that he at no time agreed to take $4,000, and that neither he nor Mr. Pederson ever had authority from defendant to accept any such sum.

Mr. Johnston Wilson, a witness for plaintiffs testified that he was assistant State Counsel for the HOLC and that the reason that the Killgreen application for a loan on the aforementioned premises was cancelled, was because the mortgagee refused to accept bonds in the amount the HOLC was permitted to offer.

The complaint alleges that in reliance on the oral agreement to convey, made with defendant, the plaintiffs expended the sum of $850.00 in "permanent improvements" on the premises. The evidence in respect to that allegation shows the following:

Mr. Killgreen testified: "I done a good many improvements on my property" in the winter of 1934 and 1935; that he put a new roof on the house about the time that the deed aforementioned, was given to defendant; that he reconstructed a pump-house, and built a concrete foundation for the same, "and installed an electric motor to replace the gasolene power we had". He testified that the cost of the pump-house was $35.50; the cost of the pump and electric motor was $150 and the installation of the same cost about $15; a new cabinet in the kitchen and new hardware in the kitchen, $35; plastering and papering, $85.50; miscellaneous repairs on doors and windows, $15; carpenter work and cold-water paint in the basement, $50; rebuilding fences, $35; trees cut up and hedges trimmed, $50; repairs on barn doors, $25; concrete porch floor, $40.45. He further testified that he had expended $450 for a new roof, but that was before the time plaintiffs alleged that the oral agreement, above referred to, had been entered into. He testified that the land was worth $500 per acre without the improvements.

On cross-examination Mr. Killgreen testified that he had purchased the pump and motor from a Portland firm some time prior to November, 1934. "I had the improvement planned for some time. If I was away from home my wife wasn't able to start the gas motor we had. It was very hard to start if she ran out of water, but it was bought for some time." He later

testified that he had bought the pump "the year prior to this (1934)".

He further testified that the plastering of a spare room was done because: "There was a reason, because the government appraisers, the Home Loan appraisers came out—and I wanted it finished any way. And they really didn't insist, but said the building should be put in good repair in order to make their loan."

Mr. Killgreen's memory was very hazy as to the exact cost of the items mentioned and of the cost of labor employed and materials purchased. He had no recollection of the cost of the separate items with the exception of the labor item on the concrete porch floor—"sixteen or twenty dollars", and the cost of the cold-water paint, used in painting the basement— "Eight or ten dollars probably. The material cost twelve cents a pound."

Most of the labor was performed by Mr. Killgreen himself.

In the forcible entry and detainer action Mr. Killgreen swore, in an affidavit under date of June 10, 1934, that plaintiffs had expended $2,000 in repair of the property and among the items included was $450 for reshingling the roof of the dwelling house. Mrs. Killgreen could not remember anything about the items included in the claim of improvements in the sum of $2,000 in her affidavit filed in the forcible entry and detainer action, but Mr. Killgreen upon being recalled to the stand stated that the purpose of filing the above-mentioned affidavit, showing that repairs had been made in the sum of $2,000, was to show that: "We had improved the property to the extent of two thousand dollars during the life of this mortgage." The record does not disclose the date of the execution of the mortgage.

We may disregard the roofing item of $450 and also of the water pump—$150—which Mr. Killgreen testified that he purchased prior to November, 1934, but installed afterwards. Disregarding the two above-mentioned items, the most that could have been expended would have been $396.45.

The most to be said for the evidence in respect to the above balance is that it is very vague, general, and unsatisfactory. No invoices or receipts, time books or calculations, other than a general memorandum, which the witness used to refresh his memory, were referred to or offered in evidence. As to the evidence regarding the particular items, Mr. Killgreen could remember nothing exactly. The labor was done in the larger part by himself. Some trees blew over in stormy weather, and for disposing of them, and trimming the hedges, he charges $50. As to the plastering item of $85.50, his testimony is that it was done at the suggestion of the HOLC appraisers, but whether it was before or after the date of the alleged oral agreement, is not clear. No exact dates in regard to the time that any of the improvements were made, were established. He further testified that some of the material used in repairs, such as lumber, was already on the place. Mrs. Killgreen testified that the place constantly required repair.

The whole testimony would indicate that the improvements made were rather in the ordinary course of keeping a property in habitable condition and not performed in reliance on the alleged agreement. In fact, Mr. Killgreen testified: "My wife was attending to the matter and as long as we were not notified or disturbed, we remained quietly on the place and took care of it. Q. You were doing such work and repairs as were proper and necessary about the property?

A. Yes, sir; what we thought was necessary. Q. For your comfortable use of the property? A. Yes, sir; as we always had done. Q. And what was necessary for a comfortable living in the property, and keeping it up in decent condition? A. Yes, sir.''

It will be observed that plaintiffs remained in possession of the premises from December 7, 1931, the date of the execution of the deed to the defendant, during which time he paid only four or five months rent. The rental value of the premises would more than offset the value of the permanent improvements claimed to have been made.

■ An agreement for the sale of real property, or any interest therein, is void, unless the same or some note or memorandum thereof be in writing and subscribed by the party to be charged or his lawfully authorized agent: Oregon Code 1930, § 9-909. However, where certain acts are done in improvement of the land, in reliance upon the oral agreement to convey, then the case avoids the rule announced above and takes it out of the statute of frauds: *Dunis v. Director*, 121 Or. 500 (255 P. 474). But in this case, in respect to those improvements:

"The evidence is not of that degree of clearness and certainty required when it is sought to overcome the effect of the statute of frauds. The general rule is that the plaintiff must prove the agreement as well as his part performance of it, clearly and unequivocally by the preponderance of the evidence. If the testimony taken all together is equivocal in its effect, so that it is left uncertain which is the true solution of the question, the plaintiff has failed to make his case by the preponderance of the testimony." *Le Vee v. Le Vee*, 93 Or. 370 (181 P. 351, 183 P. 773).

■ Certainly in the instant case, the evidence of the oral agreement to convey and the evidence of the im-

provements claimed to have been made in reliance thereon, is not of "that degree of clearness and certainty required when it is sought to overcome the effect of the statute of frauds": *Le Vee v. Le Vee,* supra.

■ The testimony of plaintiff shows that the oral agreement, claimed to have been entered into, was made with an agent of defendant. There is no testimony showing, or tending to show that the agent had authority to make such an agreement as alleged. It is unnecessary to cite authorities to the rule that a principal cannot be bound by the acts of the agent beyond the scope of the agent's authority.

The decree of the circuit court will be affirmed without costs to either party in this court.

It is so ordered.

BEAN, C. J., RAND and BAILEY, JJ., concur.