Argued January 12; reversed February 23, 1944

# HORNER *v.* WAGY
### (146 P. (2d) 92)

Before Bailey, Chief Justice, and Belt, Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*David Sandeberg,* of Portland (George P. Winslow, of Tillamook, and Sheppard & Phillips, of Portland, on the brief) for appellant.

*Ralph R. Bailey,* of Portland (Maguire, Shields, Morrison & Biggs, of Portland, on the brief) for respondent.

LUSK, J.

This is an action in deceit growing out of the sale to the plaintiff of personal property comprising the equipment and good will of a laundry and dry cleaning business in Tillamook, known as Crystal Laundry and Economy Cleaners. A jury trial resulted in a verdict for the plaintiff in the sum of $5,000.00. From the consequent judgment the defendant has appealed.

An instruction given by the court on the measure of damages duly excepted to by the defendant was, in our opinion, erroneous and makes a reversal necessary.

The complaint on which the case was tried, after alleging certain false representations made by the defendant which induced the plaintiff to agree to purchase the property for the sum of $17,000.00, alleged that if the property had conformed to the representations "the properties and good will of said business so purchased by plaintiff would have had a value approximately equal to the purchase price paid therefor, to-wit, $17,000.00", but that in fact they "did not exceed in value the sum of $5800.00". Damage in the amount of $11,200.00, being the difference between these two sums, was alleged accordingly.

The instruction on the measure of damages was as follows:

"If you find that the plaintiff was induced to enter into the contract for the purchase of the

laundry by the false representations of the defendant, as alleged in the amended complaint, upon the discovery of the fraud he could either affirm the contract and sue for damages, if any, sustained by him, or rescind the contract. Here the plaintiff has elected to affirm the contract and sue for damages alleged to have been sustained by him as a result of the alleged fraud. The defendant is liable for such damages as are the natural and proximate result of such alleged fraud, if there were fraud. Therefore, if you find that by reason of the defendant's fraud the plaintiff lost the benefit of a bargain, then the measure of the plaintiff's damage is the difference between what the property would have been worth if it had been as represented by the defendant and the actual value of the property at the time of sale. Thus, if you find from the evidence that the property would have been worth $17,000.00 if it had been as represented by the defendant, and that the actual value of the property at the time of the sale was, as alleged in the complaint, only $5800.00, then the measure of plaintiff's damages is $11,200.00. If you conclude that the proof of value is so vague as to cast practically no light upon the value of the property had it conformed to the defendant's representation, then damages may be awarded equal to the loss plaintiff actually sustained by the fraud, if any. In that case the contract price which the plaintiff agreed to pay for the property is some evidence of the value which the property would have had if such property had been as represented by the defendant.

"You are instructed, however, that in no event can you allow damages in favor of the plaintiff in excess of the amount alleged in his amended complaint, namely, $11,200.00."

■ It is apparent from the complaint and the instruction (which was requested by the plaintiff) that both counsel for the plaintiff and the learned judge of

the court below have misinterpreted the opinion of this court in *Selman v. Shirley,* 161 Or. 582, 85 P. (2d) 384, 91 P. (2d) 312, 124 A. L. R. 1. That case enunciated the doctrine that in an action in deceit the plaintiff is not necessarily limited in his recovery of damages to the difference between the purchase price of the property sold and its actual value—the so-called out-of-pocket-loss rule; but that there may be cases—of which *Selman v. Shirley* was held to be one—where the rule of full compensation demands that the defrauded person be awarded the benefit of his bargain, that is, "the difference between the value of what he would have received if the defendant's representations had been true, and the value of what he actually did receive in the transaction": McCormick on Damages, 451, § 121. For example, had it been alleged in this case and had the proof clearly shown that the property in question would have been worth $25,000.00 if it had conformed to the representations, then, under *Selman v. Shirley,* the measure of damages would have been the difference between $25,000.00 and the actual market value of the property received by the plaintiff. But inasmuch as the represented value in the instant case was the same as the purchase price, $17,000.00, there was no occasion to invoke or apply any other than the out-of-pocket-loss rule, for an award of damages under that rule would fully compensate the plaintiff for his loss. The only cases in which the so-called benefit of the bargain rule comes in, are those where the represented value exceeds the contract price. The rule derives its name from the fact that under it damages may be awarded in excess of the difference between the contract price and the value of the property received, to the end that the plaintiff shall not be deprived of the bargain which he was fraudulently induced to expect when he entered

into the transaction. Consequently, when the complaint does not allege that the value of the property, if it had been as represented, was greater than the purchase price, the only possible measure of damages is that based on the out-of-pocket-loss. (There, of course, may be, in addition, consequential damages, but these have no bearing on the present question.)

 In the instant case, therefore, the plaintiff had no reason to allege the loss of a bargain nor the court to instruct the jury on that subject. An instruction based on the out-of-pocket-loss rule would have given the plaintiff all that he was entitled to under the pleadings and the proof. But inasmuch as the court told the jury in substance that they could award the plaintiff the difference between $17,000.00, the contract price, and the actual value of the property, there was, so far, no error which would have warranted reversal. Substantially, the instruction embodied the correct rule of damages; and the principal effect of the inapposite references to the benefit of the bargain was unduly to favor the defendant, for it was wholly unnecessary for the plaintiff to prove that the property, had it conformed to the representations, would have been worth $17,000.00 or any other sum.

The remainder of the instruction, however, left the jury without any guide whatever. They were told:

"If you conclude that the proof of value is so vague as to cast practically no light upon the value of the property had it conformed to the defendant's representation, then damages may be awarded equal to the loss plaintiff actually sustained by the fraud, if any."

The court did not advise the jury by what rule they should (in the contingency assumed) measure "the

loss actually sustained by the fraud'', and the result was that the jury, having been given one measure of damages, which they were told they might reject, were set adrift to ascertain the amount of the plaintiff's loss according to their own notion of the matter and without the benefit of a rule of law to govern their determination. The evidence as to the value of the property ranged all the way from $6,000.00 to $30,000.00, and it is impossible to say what, if any, standard the jury adopted in hitting upon the sum of $5,000.00 as the plaintiff's damages.

In any case, it would be error to leave to the jury the question whether ''the proof of value is so vague as to cast practically no light upon the value of the property had it conformed to the defendant's representation.'' The portion of the instruction of which the foregoing quoted language constitutes a part was taken verbatim from *Selman v. Shirley* (161 Or. 609), where the court was attempting to classify the Oregon decisions with respect to the application of the two rules of damages there under consideration. The court did not intend, in using that language, to indicate an approved form of instruction. Nor did the court say or intimate that the jury should determine in a proper case whether ''the proof of value is so vague'', etc. That would be a question of the sufficiency of the evidence, because if proof is so vague that it throws no light on an issue, it is too vague and speculative to be submitted to a jury. *Vale v. State Industrial Accident Com.*, 160 Or. 569, 576, 86 P. (2d) 956. Consequently, in a case where the question is properly raised as to whether the plaintiff is entitled to recover damages measured by the loss of the bargain, it is for the court and not the jury to determine whether the evidence is

sufficiently definite and clear to warrant a finding of the value which the property would have had if it had been as represented. See McCormack on Damages 454, § 121. And, where the evidence upon that subject is not sufficient, then the plaintiff, by ruling of the court, will be relegated to the recovery of his loss, measured by "the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it": Restatement of the Law of Torts, § 549.

Consideration of the questions raised by the remaining assignments of error calls for a brief statement of the material facts.

The defendant Marie H. Wagy is the widow of Ernest U. Wagy, who died May 18, 1940, and was, at the time of his death, the owner of the Crystal Laundry and Economy Cleaners, which will hereinafter be referred to as the laundry. Mrs. Wagy had worked in the laundry prior to her husband's death. She was nominated one of two co-executors of his will, and, on May 25, 1940, she took over the management of the business and continued to manage it until September 3, 1940, at which time she delivered possession of the property to the plaintiff. He was then a resident of Kansas and had been in the laundry business there for twenty-one years. The defendant got in touch with him by mail, and, in response to a letter written by her, he came to Tillamook about the 10th of August, 1940, and remained there for six days. At the end of that time the plaintiff and her co-executor entered into an agreement in writing for the sale of the laundry, including the good will of the business, for the sum of $17,000.00, $6,500.00 of which was paid in cash and the balance agreed to be paid at the rate of $100.00 per month with

interest at the rate of six per cent per annum on the deferred payments. By the contract the executors also agreed to rent the building in which the laundry was housed to the plaintiff for $50.00 per month. Possession was agreed to be given on September 1, 1940.

In the meantime Mrs. Wagy continued to operate the business.

All the plaintiff's dealings looking to the purchase of the property were with the defendant Marie H. Wagy, and her co-executor had no part in them. During the six days that the plaintiff was in Tillamook before the execution of the contract he spent most of his time in the laundry and made one or two trips with the drivers on their regular routes. There is a dispute in the testimony as to the extent of the investigation which he made of the business and also as to his opportunities for ascertaining the facts which might throw light on its value. The defendant testified that all the books of the concern, except the "large monthly journal", were in the laundry, where the plaintiff had access to them; the plaintiff swore that the only records he saw were certain sheets showing the weekly revenue for July and a part of August, 1940, and that the defendant told him that the other books were at the office of her attorney, Mr. Barrick, who was out of town. The plaintiff testified that he talked to employees about the business and also made inquiry at the bank concerning it.

Seven fraudulent misrepresentations are alleged in the complaint. Four were withdrawn from the consideration of the jury by the trial judge and the remaining three submitted to them. In addition to the alleged fraudulent misrepresentations, the complaint further charges that between August 15 and September 1 the

defendant, in pursuance of her scheme and plan to defraud the plaintiff, deliberately antagonized the two largest customers of the laundry and brought about the loss of their patronage, and committed other wrongful acts—all for the purpose of making it impossible for the plaintiff to comply with the terms of the contract and of thereby causing him to lose the down payment and any other payments that he might make on the contract; and that as a result the plaintiff has been unable to make such payments and the defendant has threatened to terminate the contract and forfeit his interest in the property. These matters were also withdrawn by the court. The evidence discloses that the defendant did terminate the contract and repossess the laundry on June 1, 1941.

The alleged misrepresentations submitted to the jury were as follows:

(1) That the Crystal Laundry and Economy Cleaners was a profitable business, taking in from $450.00 to $600.00 per week, and that plaintiff would not have the least bit of trouble in making the payments on said contract out of the profits of the business. It is alleged that in fact the business was not operating at any substantial profit, and it was entirely impossible to meet the payments required by the contract or any substantial portion of them out of the profits of the business, and that the normal gross income from the business was running from $289.00 to approximately $500.00 per week.

(2) That the prices charged by the defendant for all laundry work were those shown on a certain price list, a copy of which is attached to the complaint; whereas in fact these were not the prices charged the customers, but the defendant had built up a practice of

cutting prices on all laundry sent in by commercial establishments, which cut prices varied as to each establishment and were in general at least thirty-five per cent below the prices shown on the price list.

(3) That the only other laundry in town furnished no competition and was practically out of business; whereas in fact the competing laundry was doing a large volume of business and furnished very serious competition.

We will state later the evidence in support of the second of the above charges, relating to the price lists.

The evidence as to the other two charges is as follows: The plaintiff testified that the defendant told him that over a period of a year the income of the business was $450.00 to $600.00 a week. He further testified:

"Q Now did you have any conversation with the defendant as to whether—as to whether or not the business was a profitable business at the time you took it over?

\* \* \*

"A She said it was a going, and very profitable business.

"Q Did you have any conversation with her as to the net profits of the business, what the business was taking in at that time?

\* \* \*

"A I asked her what the net profits were on the amount or volume of business, and she said she could not tell because the books were in the hands of the attorney and also in the hands of the auditor or the book-keeper, in other words."

\* \* \*

"Q What conversation did you have with her where this $100 a month was to come from, you were to pay her in the future?

"A Out of the business, and with the two large accounts, the hotel and the camp, would more than take care of it. Those two large accounts, the hotel and the CCC Camp would more than take care of it."

The books of the defendant reveal that during the first four months of 1940 the weekly income reached $450.00 only three times, and in many weeks fell considerably below that sum. During May, June, July and August the income measured up substantially to the alleged misrepresentation, but these are shown to be the best months of the year in the laundry business.

The net income for the period October 1, 1939, to August 1, 1940, was $595.79. There was evidence that several months prior to the transaction, while her husband was still living, the defendant had stated that the laundry was not making a profit; that "they did not take in enough to cover the pay roll."

With reference to the competing laundry, known as the Stranahan Laundry, plaintiff testified that the defendant told him that it "was not doing very well and would soon be out of business, and that I need not consider it a competitor at all". There was evidence that the gross revenue of the competing laundry during the year 1940, up to September, ranged from $1,160.00 a month to $1,500.00 a month, the latter amount being the income for August. This income, it was shown, was not sufficient to enable the owner to realize a net profit. He testified that he was in no financial difficulty in the summer of 1940, but admitted that he was delinquent in his rent, "two or three years, I guess".

On the trial the defendant challenged the sufficiency of the evidence, separately as to each charge of fraud submitted to the jury, as well as its sufficiency as a

whole, and by his assignments of error has brought these questions here.

■ We think that the evidence that the defendant told the plaintiff that the business had earned during the preceding year $450.00 to $600.00 a week, together with the proof of the actual earnings, made a jury question. It was a material misrepresentation of positive fact, and, if it was made by the defendant for the purpose of inducing the plaintiff to purchase the property and was knowingly or recklessly false, and if the plaintiff relied upon it and was misled to his injury, a verdict in his favor was warranted.

■ As stated, the plaintiff swore that the record of weekly earnings shown to him covered only a part of the month of July and a part of August. While he admitted that nothing was done by the defendant to prevent him from examining all the books, still, in view of this testimony, it was a question for the jury whether the plaintiff exercised reasonable prudence for his own protection in the circumstances, and that question was properly submitted to the jury in the court's instructions. *Southern Oregon Orchards Co. v. Bakke,* 106 Or. 20, 26, 210 P. 858; *McCabe v. Kelleher,* 90 Or. 45, 55, 175 P. 608; 27 C. J., Fraud 76, § 216.

■ The contention that the plaintiff is, as a matter of law, precluded from asserting that he relied on the representation because he could have learned the truth by an examination of the defendant's books does not accord with the law as announced in the decisions of this court: *J. C. Corbin Co. v. Preston,* 109 Or. 230, 248-250, 212 P. 541, 218 P. 917. See, also, *Bond v. Graf,* 163 Or. 264, 271, 96 P. (2d) 1091; *Boord v. Kaylor,* 114 Or. 62, 66, 234 P. 263; *Steen v. Weisten,* 51 Or. 473, 477, 94 P. 834. The cases cited by the defendant have to do

with representations as to the value or condition of land or personal property, where the person claiming to have been defrauded has made an investigation and the subject of the representations is "open, patent and visible": *Ziegler v. Stinson*, 111 Or. 243, 252, 224 P. 641; *Linebaugh v. Portland Mortgage Co.*, 116 Or. 1, 15, 239 P. 196; *Reimers v. Brennan*, 84 Or. 53, 59, 164 P. 552; *Allen v. McNeelan*, 79 Or. 606, 611, 156 P. 274. The doctrine of these cases is not controlling where the representation relates to something intangible, such as the earnings of a business.

Different considerations, however, apply to the representations respecting the profits of the business.

 Mere expressions of opinion, it is well settled, are not actionable: *Castleman v. Stryker*, 107 Or. 48, 213 P. 436. It is not always easy, however, to determine whether a representation is to be taken as an opinion or as a statement of positive fact. Generally, statements by the vendor commendatory of the thing which he is trying to sell, such as that it is a good investment (*Howard v. Merrick*, 145 Or. 573, 579, 27 P. (2d) 891), or a money maker (*Black v. Irvin*, 76 Or. 561, 149 P. 540), or that it is of great value (*Grant v. Cartozian Bros.*, 120 Or. 607, 611, 253 P. 531), or statements or representations as to the future profits of a business (*Haney v. Parkison*, 72 Or. 249, 257, 143 P. 926, Ann. Cas. 1916D, 1035; see annotation, 51 A. L. R. 94, et seq.), are held to be merely expressions of opinion upon which the vendee has no right to rely; although representations couched in similar language, may, according to the circumstances, be deemed misrepresentations of fact. Thus, in *Patterson v. Western Loan and Building Co.*, 155 Or. 410, 144, 62 P. (2d) 946, it was held that a false statement that stock, to be issued by an

insolvent corporation, would be a good investment, made to a person ignorant of the facts who believed it to be true and acted upon it to his detriment, was not a mere expression of opinion but a fraudulent misrepresentation of an existing fact or condition of things.

In *Turk v. Botsford,* 70 Or. 198, 139 P. 925, a representation that the plaintiffs would be able to earn a certain named sum a day cutting timber into ties and would be employed a certain length of time, was held to amount to an affirmation of fact, since the parties were not dealing on equal terms and the person making the statement had, or was presumed to have, means of information not open to those to whom the representation was made. In *Van de Wiele v. Garbade,* 60 Or. 585, 593, 120 P. 752, the assertion that the business of a corporation was solvent and upon a paying basis was held to be a statement of fact, capable of being proved or disproved.

As the court said in *Belka v. Allen,* 82 Vt. 456, 74 A. 91:

> "A statement which is in form only an expression of opinion, may in certain circumstances amount to an assertion of fact; and conversely, a statement which is in form an assertion of fact, may in certain circumstances amount to an expression of opinion merely."

The rule is said to be that "in order to amount to fraud, a representation as to value must be coupled with some untrue or misleading statement of fact used to reinforce the opinion, and not only so, but, further, that the person alleged to have been defrauded must have been thereby induced to forego further inquiry as to the worth of what he would acquire": *Allen v. McNeelan,* 79 Or. 606, 611, 156 P. 274. See

*Olston v. Oregon Water Power & Ry. Co.,* 52 Or. 343, 355, 96 P. 1095, 97 P. 538, 20 L. R. A. (N. S.) 915; *Boelk v. Nolan,* 56 Or. 229, 237, 107 P. 689; *Jeffreys v. Weekly,* 81 Or. 140, 147, 158 P. 522, Ann. Cas. 1918D, 690. "An expression of opinion", it is said, "may be so blended with statements of fact as to become itself a statement of fact": *Ward v. Jensen,* 87 Or. 314, 319, 170 P. 538 (quoting 20 Cyc. 18). The matter is well put in *Holcomb & Hoke Mfg. Co. v. Auto Interurban Co.,* 140 Wash. 581, 250 P. 34, 51 A. L. R. 39, where, in speaking of the distinction between a mere expression of opinion and a statement of fact blended with expression of opinion, the court said of the latter that "it is an implied assertion that he knows facts which justify and make certain his opinions." Probably it is true, as stated in *Belka v. Allen,* supra, that "there is no certain and unbending rule which can be applied to all cases." Each case must depend in a measure upon its own facts: 26 C. J., Fraud 1083, § 21.

In the generality of cases the question whether a representation is a statement of fact or an expression of opinion should be left to the jury: 27 C. J., Fraud 74, § 210; 26 C. J., Fraud 1084, § 21; *Ward v. Jenson,* 87 Or. 314, 320, 170 P. 538; *Smith v. Anderson,* 74 Or. 90, 144 P. 1158. But, "when the form of a statement, and the subject matter or the circumstances under which it was made, are such that it cannot fairly be construed as anything but an expression of opinion or belief, it is proper for the court so to hold, and to refuse to submit the question to the jury": 27 C. J., Fraud 74, § 210; *Howard v. Merrick,* supra; *Belka v. Allen,* supra.

The facts of the instant case are, perhaps, unique, for the plaintiff is forced to take the position that the defendant made a statement of positive fact

concerning a matter of which she professed to be ignorant. If she did not *know* what the net profits were she could have only an opinion as to whether the business was very profitable or sufficiently so to enable the plaintiff to make the payments required by the proposed contract, and, since she told the plaintiff that she did not know, it must have been apparent to him that she was expressing only an opinion or a prediction. The parties were dealing at arm's length. There was no relationship of trust or confidence. He was an intelligent man with twenty-one years' experience in the very kind of business they were discussing, and he had spent the better part of six days in investigating the subject matter of their negotiations.

The defendant's statement that she did not know what the net profits were, and could not tell because the books were in the hands of her attorney, so far from inducing the plaintiff to forego further inquiry, should have put him on his guard. In the circumstances, it stamps the accompanying representations concerning the net profits of the business as nothing but her opinion, known to him to be such, upon which he was not entitled to rely, and therefore not actionable. We think it was error to submit this charge to the jury.

In the defendant's brief an instruction given on this phase of the case is criticized as contrary to the rule of scienter in this state. While the view that we have taken that the representation as to net profits is not actionable, makes it unlikely that the question will arise again on another trial, we think it well, nevertheless, to notice the objection. By the instruction the jury were told that they could find that the representations concerning profits constituted fraud, ''even though the defendant did not know whether

such representations were true or false''. This court is committed to the doctrine that scienter, as an element of actionable fraud, is imputable only when a statement is attended by conscious ignorance of, or reckless indifference to, its truth or falsity on the part of the one making it: *Medford National Bank v. Blanchard,* 136 Or. 467, 299 P. 301; *Howard v. Merrick,* supra (145 Or. 579). The language of the instruction which we have quoted could have been taken by the jury to mean that a finding of fraud was authorized even though the misrepresentations were made negligently, without knowing whether they were true or false. The rule as to scienter was correctly explained at other places in the charge of the court to the jury, and, taking the instructions as a whole, the giving of the instruction complained of would possibly not constitute reversible error, but we think the language quoted is misleading and should have been omitted.

▋ The only contention urged by the defendant, either in the circuit court or here, with respect to the representations concerning the competing laundry is that the evidence does not support the charge that the representations were false. We think that it cannot be so determined as a matter of law. Although the volume of business done by the Stranahan Laundry was small compared to that done by the defendant's laundry, it does not follow that in a town the size of Tillamook, the population of which in 1940 was 2,751, this competition would not seriously affect the defendant's business; nor does the fact that the Stranahan Laundry had never made a net profit conclude the question, since it would be the volume of business lost to the defendant by this competition that would determine its effect. It is not unreasonable to assume that

if there were only one laundry it would get all the business. We think also that the testimony of Mr. Stranahan, the proprietor of the competing laundry, sufficed to make a jury question as to the truth or falsity of the representation that he was "practically out of business". He was still in business at the time of the trial.

We come next to the alleged misrepresentations concerning the price lists.

The plaintiff testified that when the defendant told him that the laundry was earning from $450.00 to $600.00 a month he "asked her what she was getting, and she said she had a commercial listing on these accounts, and she showed me the price list they charged for the laundry." He thereupon identified Plaintiff's Exhibit 2, a printed price list which he testified was a "domestic form", which was submitted to him by the defendant before he made the purchase. He further testified that there was no printed form for the commercial list like Exhibit 2, and that the commercial list contains the prices charged hotels, barber shops, etc. He was asked on cross-examination: "Didn't she give you a commercial price list?" And he answered: "No, she didn't give me the price list. She told me what the commercial price was. There was no commercial price list at all. She just told me what it was." He then identified Defendant's Exhibit C, a typewritten price list consisting of several pages, which he said showed the commercial listing and was given to him by the defendant after he took possession of the plant. Page 2, he said contained the commercial list (mostly hotels), and the following pages contained confidential lists of cut prices to individual customers or business firms. These cut prices, he

said, were not "on the commercial list", and again they were not a "commercial list" but a "cut price list".

The foregoing is the substance of plaintiff's testimony on this subject. The defendant testified that she showed him the commercial price list upon his arrival in Tillamook in August.

According to the complaint the alleged false representation was that the prices on the list shown the plaintiff were for *all* laundry. This representation was alleged to be false in that "the defendant had built up a practice of cutting prices on all laundry *sent in by commercial* establishments." The proof is that there were two price lists—one domestic and the other commercial; and that the plaintiff was shown the domestic price list and told of the existence of the commercial price list. He did not testify that the domestic prices were represented to be the same as the commercial prices, and there is nothing in the evidence from which such a representation can be inferred. There is no evidence that the defendant told the plaintiff that the prices on the domestic list were for all laundry or were being charged to commercial customers. And, while the plaintiff testified that the defendant told him what the commercial price was, he did not testify that she represented any commercial price to be different from those in the so-called confidential list.

Hence, the allegation that the prices shown to the plaintiff were the prices charged by the defendant for all laundry work is not borne out by the evidence. On the other hand, while there is evidence that there was a confidential cut price list for domestic customers, of which the plaintiff was kept in ignorance until he

took possession of the laundry, the complaint does not charge falsity of the representation in that particular, but only that the defendant had a practice of cutting prices charged commercial establishments.

The sum of the matter is that the representation was not proven as alleged, and to the extent that it was proven it was not shown to be false in the particular alleged. In view of the rule that the proof must conform to the allegations of the pleading, and, since the plaintiff has the burden of proving fraud by clear and convincing evidence, we think that it was reversible error to submit to the jury the charge of fraud under discussion.

The defendant assigns as error the giving of the following instruction:

"You are instructed, however, that if representations are made with an intention to deceive and mislead the one to whom they are made and to induce him to forebear making inquiry which he would otherwise have made, and he is thereby induced to forebear making such inquiry, he cannot be held chargeable for negligence in failing to make such inquiry."

It is argued that the instruction has no basis in the evidence; but we think that, where fraudulent misrepresentations are established in a case like this, it may be found that a part of the fraud was the intention to forestall inquiry by the positive assertion of things known to be untrue. See 26 C. J., Fraud 1151, § 68. The instruction would seem to be a corollary of the well-established rule that a vendor who has misrepresented a material fact to his prospective vendee will not be permitted to say to him: "You ought not to have believed or trusted me", or "You were

yourself guilty of negligence." *Boord v. Kaylor,* supra (114 Or. 66); *J. C. Corbin Co. v. Preston,* supra (109 Or. 249).

From the foregoing it follows that the defendant's motion for a directed verdict was properly denied; but, for the errors pointed out, the judgment must be reversed and the cause remanded for further proceedings conformable to this opinion.