Argued March 9, affirmed as modified April 27, 1955

# AMORT *v.* TUPPER

282 P. 2d 660

*William K. Shepherd*, of Portland, argued the cause and filed briefs for appellant.

*John E. Walker*, of Portland, argued the cause and filed a brief for respondent.

Before WARNER, Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

PERRY, J.

The plaintiff commenced a suit against the defendant to foreclose a chattel mortgage upon personal property situated in Clackamas county, Oregon, which mortgage was given to the plaintiff by the defendant to secure a promissory note in the original sum of $7,000.

The defendant admits the execution and delivery of the note and the chattel mortgage. He defends on the grounds of want of consideration and fraud, alleging that the note and mortgage arose out of a transaction whereby he purchased from the plaintiff 11 shares of stock in the Contractors Supply Company, an Oregon corporation, for the sum of $12,000; that in the purchase of the stock he relied upon representations of the plaintiff that the business of the corporation from its incorporation in March, 1950, had been conducted on

a profitable basis, that the assets of the corporation exceeded the liabilities of the corporation, and that the 11 shares of stock were worth $12,000; that said representations were false, and that the plaintiff falsely and fraudulently withheld from him the books and records of the corporation. Defendant further alleges that, on discovering the fraud, he demanded the return of the moneys he had paid to the plaintiff, and the return of the note. As a further defense and counterclaim, based upon this alleged fraud, the defendant sought damages from the plaintiff in a sum equalling his payments on the purchase, together with interest thereon from the date the payments had been made.

The trial court by its decree ordered the surrender and cancellation of the note and mortgage, and rendered a money judgment for the defendant and against the plaintiff for all payments made. From this decree the plaintiff has appealed.

The evidence in this case shows that in March, 1950, the plaintiff, who was operating an appliance sales company, incorporated "Contractors Supply Company". The Contractors Supply Company dealt in building materials, and was principally engaged in the resawing of lumber to specifications for building contractors. The defendant was a sawmill operator, and supplied lumber to the Contractors Supply Company. In June or July, 1950, the defendant and the plaintiff, who had known each other for a period of approximately 10 years, discussed the possibility of the sale of the Contractors Supply Company by the plaintiff to the defendant. The transfer of ownership and control of the company was to be accomplished by the assignment of 11 shares of stock of the company, the other two shares of the capital stock of the company being held by others merely for the purpose of qualifying them as directors. During a portion of the time that

the sale was being discussed, a Mr. Uehlinger, who was operating a sawmill and supplying lumber to the Contractors Supply Company, was interested with the defendant in the purchase of the plaintiff's business.

There is a conflict in the testimony as to the date on which defendant took active control and supervision of the Contractors Supply Company. The actual transfer of the stock and the execution of the note and mortgage in question was made on November 2, 1950, but the evidence is quite clear that a Mr. Regula, a representative of the defendant, was handed the books of account, such as they were, in October, 1950, and he made a trial balance early in November, 1950. The trial court, we believe, correctly determined the actual sale date as of September 30, 1950. There is no evidence that any of the accounts payable or accounts due were withheld from the defendant.

At the time of the transfer of the stock, and the execution of the note and mortgage, a stockholders meeting was held and a new board of directors elected, consisting of the defendant Tupper, Frank Tawney, who had been acting as manager of the company, and Otto Motejl. At this meeting there was discussed an offer of a franchise made by the F. C. Russell Company, builders of windows, whereby the Contractors Supply Company would receive the exclusive dealership of the windows if the company could meet the financial requirements set down by the Russell Company. Otto Motejl offered to advance $32,000, the necessary amount, upon being satisfied of the financial worth of the Contractors Supply Company. Resolutions were duly passed authorizing the company to enter into a franchise agreement with the F. C. Russell Company, setting up the $32,000 provided by Motejl as a separate fund. On November 3, 1950, an application on behalf of the Contractors Supply Company was

sent to the F. C. Russell Company. A special meeting was held by the board of directors of the Contractors Supply Company on November 16, 1950. At that meeting Motejl stated he had been induced to supply the $32,000 on the representations of Mr. Tupper and Mr. Tawney that the company was solvent and its net worth was over $9,000, but that bill collectors had started telephoning and coming to the company, and he was fearful that the money he had advanced would be involved. His agreement was rescinded and the moneys advanced by him were returned. However, he remained as a director of the company. Subsequent to this time the defendant paid to the plaintiff $3500 on his contract. The defendant continued to operate the Contractors Supply Company until in February of 1951, when he discovered definitely that the company's liabilities exceeded the assets, and he transferred the business to O. A. Hollenbeck on the basis that he would receive all moneys remaining over and above after payment of all claims. Defendant received no moneys from this source and later he repurchased from Hollenbeck the majority of the physical assets of the Contractors Supply Company.

The plaintiff testified that he had invested $7500 in the enterprise, and, as he remembered the figures, they had shown a profit of $5200; that he had gone over this matter to show the defendant how he arrived at that figure; that he had asked $12,700, and the defendant said he would pay $12,000; that he thought the books and records of the company as kept by his daughter were accurate.

An audit of the books and records of the Supply Company by the accountants of each of the parties, reconstructed as to the date of the sale, September 30, 1950, showed that the liabilities of the company far

exceeded the assets, and the company was in fact, as of that date, insolvent.

■ We have no hesitancy in saying that under the facts of this case the defendant is not entitled to rescind. The law is well established in this state that "a party who has been induced to enter into a contract by fraud, has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he has received under the contract. He cannot retain the fruits of the contract awaiting future developments to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract: *Schiffer v. Dietz*, 83 N. Y. 300; *Parmlee v. Adolph*, 28 Ohio St. 10; *Williamson v. New Jersey S. R. R. Co.*, 29 N. J. Eq. 311; *Wicks v. Smith*, 21 Kan. 412 (30 Am. Rep. 433); *Marston v. Simpson*, 54 Cal. 189." *Scott v. Walton*, 32 Or 460, 464, 52 P 180.

■ From September 30, 1950, the defendant had full possession and control of this corporation; he operated it as his own, creating liabilities and collecting the income without making any offer whatsoever to rescind. Even when he was placed on notice by Motejl that the liabilities might be greater than the assets he continued to make payments upon the purchase price agreed upon by the parties, and he continued the operation of the business until he finally sold and disposed of the company.

■ The decree of the trial court in entering a money judgment against the plaintiff is upon the theory that active fraud was practiced by the plaintiff in inducing the defendant to enter into the contract for the purchase of the Contractors Supply Company. The elements of actionable fraud were stated quite comprehensibly by this court in *Condit v. Bodding*, 147 Or 299, 328, 33 P2d 240, as follows:

" 'To constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with reasonable certainty, and all of them must be found to exist. The absence of any one of them is fatal to recovery * * *' "

■ The evidence discloses, and the parties seem to agree, that there are present all of the elements necessary to the recovery, except the plaintiff contends there is no clear, satisfactory and convincing evidence that the representations as made were made knowing them to be untrue. *Conzelmann v. N.W. P & D Prod. Co.,* 190 Or 332, 225 P2d 757; 37 CJS 393, Frauds § 94. There can be no question under the law of this state that in order to recover damages for deceit conscious knowledge of the untruth of a statement, or the doctrine of scienter, must be established: *Howard v. Merrick,* 145 Or 573, 27 P2d 891; *Medford National Bank v. Blanchard,* 136 Or 467, 299 P 301; however, the law recognizes that such knowledge may be imputed to the one making the representations when the statement "is attended by conscious ignorance of or reckless indifference to its truth or falsity". *Horner v. Wagy,*

173 Or 441, 459, 146 P2d 92. In other words, a definite statement of a material fact made by a party who does not know the statement to be true, and has no "reasonable grounds for believing it to be true, will, if false, have the same legal effect as a statement of what the party positively knows to be untrue". 3 Pomeroy's Equity Jurisprudence, 5 ed, 479, § 884a.

■ We must agree with the contentions of the plaintiff, that satisfactory evidence of scienter to establish actionable fraud is lacking. From all of the surrounding facts it appears that the plaintiff, who was charged with making statements, neither actively operated the Contractors Supply Company nor actively supervised the books. The active operation of the business, its purchases and its sales, was handled by its manager, Mr. Tawney. The books of the corporation which would reflect the true condition of the business were kept by the daughter of the plaintiff, who had no previous bookkeeping experience, and a perusal of the records as kept by her might easily lead one to believe that the operation was in truth progressing satisfactorily. Likewise, we are convinced that the defendant failed to take the precautions that a reasonably prudent person would take when entering into a business venture. Also, the question of his reliance upon the representations of the plaintiff is not altogether satisfactory. His testimony upon these points is as follows:

"Q  Well, now, did you make a deal with him that night?

"A  I asked him what his price was.

"Q  What did he tell you he would take for his interest?

"A  He said that his investment was the figure I gave before, about seven thousand, over seven thousand, and that the company had made five thousand from its operation and that he wanted

the benefit of that gain. This gain, however, was in bills receivable and in inventory.

"Q Now, what did he tell you regarding the accounts payable owing by the company?

"A We did not enter into the question of bills receivable or bills payable, except that in his estimation he had a net earning of five thousand dollars.

"Q Did he make any statement as to what the company owed?

"A He didn't enumerate any bills, any indebtedness. I knew that I had a bill,—he knew that I knew—of my own, and that I knew of the Uehlinger bill. Outside of that, there was no discussion.

"Q Did you ask him what bills were owed by the company?

"A I didn't ask him to enumerate.

"Q Did you ask him what the total owing was?

"A No.

"Q Did you ask him what the assets of the company were?

"A No, I didn't ask him. I figured that the visible assets, plus his investment, would be the worth of the company.

"* * * * * *

"Q Now, did you, Mr. Tupper, take an inventory of the merchandise in the yard at the time that you bought in, the merchandise for resale?

"A I formed my own opinion of what I thought the merchandise was worth."

■ The plaintiff has come into a court of equity seeking to enforce his chattel mortgage, a mortgage which would not have been executed had not the plaintiff represented (as he admits in his reply) "that the business of said company from its incorporation in March, 1950, had been conducted on a profitable basis", which representation, although innocently made, was false,

and the company in fact was insolvent. For a court of equity to lend its aid to the enforcement of this note and mortgage would be unconscionable.

The trial court refused to grant judgment for the plaintiff against the defendant for the moneys due upon the note and to foreclose the chattle mortgage securing the note, and decreed that the plaintiff should deliver up for cancellation the promissory note and the chattle mortgage. In this the trial court was correct.

██ While a court of equity follows the law, and will not permit the recovery of damages for fraud where the fraud is not consciously committed, "whatever would be fraudulent at law will be so in equity; but the equitable doctrine goes further and includes instances of fraudulent misrepresentations which do not exist in the law." 3 Pomeroy's Equity Jurisprudence, 5 ed, 487, § 885. For example, a court of equity will grant rescission of a contract even though there is fraud not intentionally or recklessly practiced. A completely innocent representation of a material fact, which, if false, but relied upon, and in fact accomplished a fraud, is all that is necessary. *Johnson et ux. v. Cofer,* 204 Or 142, 281 P2d 981; *Schuler et ux. v. Humphrey et ux.,* 198 Or 458, 257 P2d 865; *Miller et ux. v. Protrka et ux.,* 193 Or 585, 238 P2d 753; *Weiss and Hamilton v. Cumbert,* 191 Or 119, 227 P2d 812, 228 P2d 800. And while mere want or failure of consideration, whether partial or total, alone is not sufficient in equity to obtain the rescission of an executed contract, if in fact there is a want of consideration coupled with fraud, a court of equity will seize upon the slightest circumstances of oppression for the purpose of administering justice. 9 Am Jur 370, Cancellation of Instruments, § 24.

█ The defendant, in relying upon his defense of total want of consideration, has sought only to defend

against the injustice of the enforcement of the plaintiff's demand, and while the relief granted by the trial court of cancellation ordinarily could not be granted where the party has not elected to rescind promptly (*Cooper v. Hillsboro Garden Tracts,* 78 Or 74, 152 P 488), nevertheless, the power of the court of equity in granting relief which is purely equitable in nature cannot be limited. ''The court can always shape its remedy so as to meet the demands of justice in every case, however peculiar''. 3 Pomeroy's Equity Jurisprudence, 5 ed, 574, § 910.

The decree of the trial court is affirmed as modified.

Neither party shall recover costs.