Argued and submitted January 20, Court of Appeals affirmed and trial court reversed
September 22, 1987

DUYCK et al,
*Petitioners on Review,*

*v.*

TUALATIN VALLEY
IRRIGATION DISTRICT,
*Respondent on Review.*

(TC 41-164; CA A32381; SC S33201)

742 P2d 1176

Thomas J. Moore, Hillsboro, argued the cause for petitioners on review. With him on the brief was Brink, Moore, Brink & Peterson, Hillsboro.

Alfred T. McGill, Portland, argued the cause for respondent on review.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices.

PETERSON, C. J.

Campbell, J., dissented and filed an opinion.

## PETERSON, C. J.

The plaintiffs brought this action against defendant Tualatin Valley Irrigation District (TVID) alleging that TVID negligently misrepresented the availability of irrigation water and that TVID negligently failed to warn the plaintiffs that water would not be available for the 1978 growing season. The jury returned a verdict in favor of the plaintiffs. On the defendant's appeal, the Court of Appeals held that the plaintiffs' action was barred by the statute of limitations and reversed. *Duyck v. Tualatin Valley Irrigation Dist.*, 80 Or App 602, 723 P2d 1043 (1986). We affirm the Court of Appeals.

I

We state the facts in the light most favorable to the plaintiffs. The plaintiffs raise strawberries and beans. They are members of TVID. TVID successfully sought an irrigation system from the Bureau of Reclamation of the Department of the Interior. The Bureau of Reclamation was responsible for planning, engineering and constructing a new irrigation system that included an 85-mile irrigation system delivering water to Washington County farmers.[1] The plaintiffs had several farms, including the "Gregg Farm" and the "Gun Club Farm." These two farms were about a mile apart and were to be served by different branches of Unit Four of the irrigation system.

In 1976 the Bureau of Reclamation informed TVID that the irrigation system would be completed for the 1978 growing season (June through August). The Bureau of Reclamation expected to transfer the irrigation system to TVID for interim operation of the project beginning February 1, 1978. TVID, in several newsletters between May 1976 and May 1978, told its members that they could expect to receive water

---

[1] The contract between TVID and the Bureau of Reclamation, which was approved by all the individual members of the district, contained two provisions holding the United States government harmless for any failure to deliver water.

TVID's by-laws contain a similar provision that states:

"The district shall be under no duty and shall not be held liable for failure to deliver water during the irrigation season when such failure occurs from a deficiency of water or from any other causes beyond the control of the district."

The defendant has not argued before this court or the Court of Appeals that this provision bars the plaintiffs' negligence claim.

service about June 1, 1978. The plaintiffs also kept in touch with TVID's manager, Palmer Torvend, to insure that their final crop choice determinations were based on an accurate estimation of available water supplies. On numerous occasions in April and May 1978, Torvend assured the plaintiffs that they would receive water by June 1, 1978. Torvend, however, testified that he knew that Unit Four would not be completed until late summer or early fall, 1978. At least as of May 1978, Torvend knew that Unit Four would not be completed in time for the 1978 growing season, but he gave no indication in the newsletter or otherwise that Unit Four's completion date would be later than the projected date of other units, June 1978.

Believing that irrigation water would be available for the 1978 growing season, in May 1978, the plaintiffs planted Romano beans on the Gun Club Farm and "290 beans" on the Gregg Farm. Irrigation water was neither available nor necessary to plant these crops. However, these crops were eventually damaged as a result of the unavailability of irrigation water at the anticipated time.

The plaintiffs also had planned a strawberry crop on the Gregg Farm, the planting of which required irrigation water. The Unit Four irrigation pipeline branch for the strawberries and the beans on the Gregg Farm suffered a substantial leak or a "blowout" on May 28, 1978. The plaintiffs knew at this point that water would not be available from TVID for the Gregg Farm by June 1. They may have incorrectly concluded that, but for the blowout, water would have arrived on June 1. The evidence is uncontradicted that even had the May 28 leak not occurred, water would not have been delivered until late summer.

Because the plaintiffs believed that they had commitments to a cannery to grow strawberries, they proceeded with the strawberry planting after the blowout occurred. They obtained permission to use a neighbor's pond as an alternate source of water. On May 30, 1978, the plaintiffs incurred costs in transferring the water from the neighbor's pond, including costs for a pump, pipes and labor to install the system. On June 2, 1978, the plaintiffs commenced planting strawberries. By mid-June the plaintiffs believed that water would not be available for at least two additional weeks. In the first week of

July the plaintiffs obtained permission from a second neighbor to pump water from a second pond to resupply the first pond. These alternative sources of water were inadequate to prevent significant damage to the crops. The beans began to show damage in early July; by the end of the summer the strawberry planting proved to be nearly a complete failure. The plaintiffs pumped water from the neighbors' ponds until the plaintiffs finally received water from TVID in early August for the Gregg Farm.

When no water was available from TVID to irrigate the Gun Club Farm beans, the plaintiffs tilled up half the first plantings and made another planting of beans at the end of June. TVID water arrived at the Gun Club Farm on July 24, 1978. Although the first two plantings were damaged by the lack of water, the third planting resulted in a good crop.

The plaintiffs filed this action on June 18, 1980. Their complaint contained a negligence and a contract theory for recovery. The plaintiffs alleged that the defendant negligently represented that irrigation water would be available to their farms for the 1978 growing season and that the defendant negligently failed to warn the plaintiffs that water might not be available. The plaintiffs also alleged that TVID was in breach of contract for failure to deliver water by June 1, 1978. The defendant asked for and received summary judgment on the plaintiffs' contract claim.[2]

On the negligence claims, the defendant contended that the claim was not filed within the two-year statute of limitations of ORS 30.275(8). The trial court denied the defendant's motions for summary judgment and for a directed verdict on the negligence claims. The trial court also refused to present the statute of limitations issue to the jury, stating that "reasonable people could not disagree if they followed my instructions as to when the harm begins * * * that is, that it

---

[2] See note 1, *supra.* The trial court concluded that the defendant was "entitled to partial summary judgment * * * because of the exculpatory provision of the defendant district's by-laws and the uncontroverted fact that defendant had no control over the water project at the time in question." The defendant has not argued before this court or the Court of Appeals that this provision bars the plaintiffs' negligence claim.

The plaintiffs did cross-appeal from this ruling. The Court of Appeals ruled against them on the cross-appeal, 80 Or App at 609, and the plaintiffs have not petitioned for review of that ruling.

was timely filed * * *." The jury returned a verdict for the plaintiffs.

The Court of Appeals reversed, holding that the action was time-barred. 80 Or App at 608. That court agreed with the defendant's contention that "at the latest, plaintiffs' arrangement for the alternative irrigation system in early June, 1978, more than two years before the action was brought, initiated the running of the statute." *Id.* at 606.

## II

The plaintiffs rely, and the case was tried, upon the theory of liability described in section 552(1) of the Restatement (Second) Torts (1977),[3] which provides:

"(1)   One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

This court has yet to recognize the tort of "negligent misrepresentation," and as will be seen below, we do not do so herein, because we decide the case on the statute of limitations issue. We deem the statute of limitations question to be a threshold issue, and for this purpose, we shall assume the existence of such a tort in Oregon. Even so, in order to decide that issue, it is necessary to examine the nature of the tort to determine whether the tort defined in Restatement Section 552(1) arises in negligence or in deceit.

This case involves a claim for damages for economic

---

[3] We note that the parties do not elaborate as to why such a claim should or should not be recognized in Oregon; rather they devote their arguments on this issue to whether the plaintiff has pleaded and proved the elements stated in the Restatement (Second) Torts, section 552 (1977). The Restatement is not, nor does it purport to be, the law of this state or any other state. *Brewer v. Erwin,* 287 Or 435, 455 n 12, 600 P2d 398 (1979). Mere reference to the Restatement does not "substitute for an independent analysis and presentation of the elements that make, or should make, defendants liable under Oregon law, when the relevance of some of the elements to a theory of liability is an open question in this state." *U.S. National Bank v. Fought,* 291 Or 201, 227, 630 P2d 337 (1981) (Linde, J., concurring).

loss allegedly sustained from the plaintiffs' reliance upon representations negligently made by the defendant to the plaintiffs. In England, though the English courts had long recognized the forms of action of deceit and negligence, the House of Lords, in 1889, held that an action for deceit could not be maintained by a plaintiff who had been induced to enter into a disfavorable commercial or financial venture unless the false statement upon which the plaintiff relied was made "(1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Derry v. Peek,* 14 App Cas 337, 374 (1889). According to Prosser, the English rule was that, "in the absence of some fiduciary relation between the parties, there was no remedy for merely negligent misrepresentation, honestly believed, where the harm that resulted to the plaintiff was only pecuniary loss," Prosser, *Misrepresentations and Third Parties,* 19 Vand L Rev 231, 234 (1966) (footnote omitted).

The best known statement for not recognizing liability for economic loss arising from a negligent misrepresentation causing only economic loss appears in *Ultramares v. Touche,* 255 NY 170, 174 NE 441, 74 ALR 1139 (1931). In that case the New York Court of Appeals, fearing limitless liability, refused to hold an accounting firm liable for negligently certifying a firm's balance sheet. The claimants were third persons who had suffered economic losses in reliance thereon. Judge Cardozo, for the court, stated:

> "If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a *liability in an indeterminate amount for an indeterminate time to an indeterminate class.* The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences."

*Id.* at 179-80 (emphasis added).

The *Ultramares* court distinguished an earlier New York case, *Glanzer v. Shepard,* 233 NY 236, 135 NE 275, 23 ALR 1425 (1922), in which a public weigher of beans was held liable to a buyer for an erroneous weight statement — even though the weighing was at the seller's request — because the

weigher knew that the buyer would rely on the weight statement. The *Ultramares* court distinguished *Glanzer* on the ground that the weight statement was "primarily" for the benefit of the buyer, while the audit statement in *Ultramares* was "incidently" for the use of third parties.

Today many American courts recognize the tort of negligent misrepresentation, but the scope of recovery for economic loss varies widely. The New York courts limit recovery to cases in which the nexus between the parties is direct or close. *Credit Alliance Corp. v. Arthur Anderson & Co.,* 65 NY 2d 536, 551, 493 NYS 2d 435, 483 NE2d 110 (1985) ("there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or party's reliance"). At the other extreme is the view that liability is only limited by the principle of reasonable foresight. *See Craig,* Negligent Misstatements, Negligent Acts and Economic Loss, 92 Law Q Rev 213 (1976). The Restatement (Second) appears to take an intermediate position.

Oregon permits recovery for deceit. Our caselaw is clear that to be held liable for *deceit,* a defendant must be more than "merely negligent in deceiving" the plaintiff; the plaintiff must plead and prove that the defendant "intended to deceive the victim or acted in reckless disregard for the truth." *Riley Hill General Contractor v. Tandy Corporation,* 303 Or 390, 407, 737 P2d 595 (1987). *Accord U.S. National Bank v. Fought,* 291 Or 201, 630 P2d 337 (1981); *Dizick v. Umpqua Community College,* 287 Or 303, 599 P2d 444 (1979); *Bausch v. Myers,* 273 Or 376, 541 P2d 817 (1975); *Holland v. Lentz,* 239 Or 332, 397 P2d 787 (1964); *Amort v. Tupper,* 204 Or 279, 282 P2d 660 (1955); *Musgrave v. Lucas,* 193 Or 401, 238 P2d 780 (1951); *Conzelmann v. N.W.P.&D. Prod. Co.,* 190 Or 332, 225 P2d 757 (1950); *Horner v. Wagy,* 173 Or 441, 146 P2d 92 (1944); *Medford National Bank v. Blanchard,* 136 Or 467, 299 P 301 (1931); *Aitken v. Bjerkvig,* 77 Or 397, 150 P 278 (1915); *McFarland v. Carlsbad Sanatorium,* 68 Or 530, 137 P 209 (1914); *Cawston v. Sturgis,* 29 Or 331, 43 P 656 (1896).

### III

As stated, for the purpose of this opinion, we will assume, without deciding, that the relationship of the plaintiffs to the defendant is sufficiently close to permit recovery of

economic loss arising from a negligent misrepresentation. Even so, we affirm the Court of Appeals because the applicable period of limitations would be that fixed for negligence cases, rather than for deceit, and this period had run before the plaintiffs' complaint was filed.

■ In Oregon, a claim for damages for deceit commences "from the discovery of the fraud or deceit."[4] Our precedents are consistent in the holding that, to recover in deceit, a defendant must be more than "merely negligent in deceiving." Deceit requires that the plaintiff plead and prove that the defendant "intended to deceive the victim or acted in reckless disregard for the truth." *Riley Hill General Contractor v. Tandy Corp., supra*, 303 Or at 407. In addition, we have steadfastly held that, to recover damages for deceit, the proof must be stronger; it must be clear and convincing. *Id.* at 408.

The parties agree that the plaintiffs' claims arise in negligence and come within the Tort Claims Act, ORS 30.260 to 30.300. The applicable statute of limitations is ORS 30.275(3) (1980). ORS 30.275 has been amended significantly since 1980. *See* Or Laws 1981, ch 350, § 1. ORS 30.275(3) (1980) provided at the time that this case was filed: "No action shall be maintained * * * unless the action is commenced within two years after the date of such accident or occurrence."[5]

---

[4] ORS 12.110(1) provides:

"An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

We have stated that in fraud or deceit actions, the statute of limitations does not begin to run until the plaintiff should have known, in the exercise of reasonable diligence, that the defendant's conduct was tortious. *See, e.g., Mathias v. Hoeck*, 284 Or 539, 544, 588 P2d 1 (1978) ("defendant offer[ed] no evidence to show that plaintiff could have discovered this fraud by the exercise of reasonable diligence"); *Forest Grove Brick v. Strickland*, 277 Or 81, 86-87, 559 P2d 502 (1977) (remanded to determine when plaintiff, in the exercise of reasonable diligence, should have discovered the "fraud").

[5] ORS 30.275(3) (1980) provided in full:

"No action shall be maintained unless such notice has been given [as required by ORS 30.275(1) and (2) (1980)] and unless the action is commenced within two years after the date of such accident or occurrence. The time for giving such notice does not include the time, not exceeding 90 days, during which the person injured is unable to give notice because of the injury or because of minority, incompetency

The plaintiffs' claim sounds in negligence and, therefore, the two-year statute of limitations of the first clause of ORS 30.275(3) (1980) applies. Our precedents suggest this conclusion. We have consistently required that, to recover in deceit, the plaintiff must plead and prove either an intentional misrepresentation or that the defendant acted in reckless disregard for the truth. Therefore, it would be inappropriate to apply the deceit statute of limitations to a claim for negligent misrepresentation.

Moreover, the Restatement itself states that the claim is in negligence. The first sentence of Comment *a* to Section 552 states that "the rule stated in this Section is based upon negligence of the actor in failing to exercise reasonable care or competence in supplying direct information * * *."

Other courts, choosing between deceit and negligence, have held that the negligence statute of limitations is the applicable standard. *Hall v. Romero,* 141 Ariz 120, 123, 685 P2d 757 (App 1984) is illustrative. There, the question was whether the plaintiffs' negligent representations claim was governed by the fraud or negligence statute of limitations. The Arizona court held that the negligence statute of limitations applied, on reasoning similar to that set forth above. 141 Ariz at 123, 126.

As stated, the plaintiffs have not asserted, here, in the Court of Appeals or in the trial court, that ORS 12.110(1), the deceit statute of limitations, applies. Though a damage claim for negligent misrepresentation involves a misrepresentation, we believe that the theory of recovery is in negligence rather than deceit.

---

or other incapacity."

The Court of Appeals cited ORS 30.275(8), which is the current Tort Claims Act statute of limitations. It was not in effect at the time the plaintiffs filed their action. ORS 30.275(8) provides:

"Except as provided in ORS 12.120 [action on escape] and 12.135 [action for damages from construction, alteration or repair of improvement to real property], but notwithstanding any other provision of ORS chapter 12 or other statute providing a limitation on the commencement of an action, an action arising from any act or omission of a public body or an officer, employe or agent of a public body within the scope of ORS 30.260 to 30.300 shall be commenced within two years after the alleged loss or injury."

We express no opinion as to the application of ORS 30.275(8) to the facts of the case.

## IV

■ ■     When then, does the statute of limitations begin to run under ORS 30.275(3) (1980)? The statute requires that the action be commenced "within two years after the date of [the] accident or occurrence." In *Dowers Farms v. Lake County,* 288 Or 669, 680-81, 607 P2d 1361 (1981), we stated that the logic of our past interpretations of the first clause of ORS 12.110(1) is equally applicable to ORS 30.275(3) (1980).

Normally, a statute of limitations in a tort action begins to run the instant the claim or cause of action accrues. A cause of action accrues when the party owning it has a right to sue on it. *The Aurelia,* 45 Or 285, 289, 77 P 835 (1904). In *U.S. National Bank v. Davies,* 274 Or 663, 666-67, 548 P2d 966 (1976) (quoting Franks, Limitation of Actions (1959)), we stated:

> " '[I]t is necessary to consider what is meant by a cause of action. In the best known definition it consists of every fact which it would be necessary for the plaintiff to prove,. if traversed, in order to support his right to judgment. When these facts have occurred * * *, a cause of action is said to accrue to the plaintiff because he can then prosecute an action effectively.' "

*See also Jaquith v. Ferris,* 297 Or 783, 788, 687 P2d 1083 (1984).

But we have heretofore recognized a number of situations in which the statute of limitations does not begin to run. They include these:

1.   The plaintiff is unaware of the identity of the tort-feasor. *Adams v. Oregon State Police,* 289 Or 233, 239, 611 P2d 1153 (1980), held that the statute of limitations does not begin to run "until plaintiff has a reasonable opportunity to discover * * * the identity of the party responsible * * *."

2.   The plaintiff is unaware of injury. *Dowers Farms v. Lake County, supra,* 288 Or at 680-81, is such a case. The issue there was whether a claim for negligent application of an herbicide upon an adjacent county road ran from the date of application or the date "the plaintiff discovered that the young potato plants were deformed." 288 Or at 681. We held that the statute of limitations does not begin to run until discovery of harm. (It is important to note that we did not hold

that the statute of limitations began to run when the plaintiff knew or should have known that the spraying was the cause of harm. *Dowers Farms,* though expressed in terms of "harm caused by defendant," really is a Class 2 — knowledge of injury — case.)

3. The plaintiff is unaware of the cause of his injury. *Schiele v. Hobart Corp.,* 284 Or 483, 587 P2d 1010 (1978), is such a case. We held that the statute of limitations on an occupational disease claim begins to run when a reasonable person would perceive "the role which the defendant has played in inducing that condition." 284 Or at 490.

The plaintiffs base their claim upon the Restatement (Second) Torts, section 552 (1977). Under the Restatement (Second), the claim is complete when (1) the actor negligently "supplies false information for the guidance" of the plaintiffs, and (2) the plaintiffs sustain "pecuniary loss caused to them by their justifiable reliance upon the information." This suggests that the statute of limitations on a claim for negligent misrepresentation begins to run when the plaintiffs knew or should have known that they had a loss caused by their reliance upon the defendant's information. This is consistent with *Adams, Dowers Farms* and *Schiele,* and it directly tracks the elements of misrepresentation, reliance and injury. The causal nexus required by section 552 — "*loss caused to them [the plaintiffs] by their justifiable reliance upon the information*" — is met.

On June 1, 1978, the plaintiffs knew that reliance on defendant's representations regarding the availability of water had placed them into a predicament in which they needed an alternative source of water. It may not have been clear to them whether the defendant was at "fault" for the *incorrect forecast of the date that water would be available.* (This might have been a key factor had the plaintiffs pleaded a deceit claim.) There existed, nonetheless, a causal link between the plaintiffs' damages and the defendant's conduct. The plaintiffs, by June 1, 1978, had expended money in reliance upon the defendant's representations, which were then known to be untrue. In law school terms, "but for" the defendant's representations and the plaintiffs' reliance thereon, the plaintiffs would not have incurred damages on June 1, 1978. On June 1, 1978, the plaintiffs knew that the

defendant's representations regarding the availability of water were "misrepresentations," *i.e.,* assertions not in accordance with the facts, Black's Law Dictionary 903 (5th ed 1979) and that they had a loss caused to them by their reliance on the defendant's misrepresentations, for which they then might have filed a damage action.

*Bollam v. Fireman's Fund Insurance Co.,* 302 Or 343, 730 P2d 542 (1986) and *Jacquith v. Ferris, supra,* support this result. In *Jacquith,* plaintiff seller sued defendant real estate broker for misrepresenting the value of her property. The misrepresentation resulted in the plaintiff signing an earnest money agreement with a buyer for an amount far less than the fair market value of the property. Subsequently in May 1978 the plaintiff discovered the true market value of the property. She refused to proceed with the sale and was sued for specific performance, losing her final appeal in September 1980. We stated that there was no doubt as to the cause of her harm once she discovered the true market value and that it was at this point that the statute of limitations began to run. 297 Or at 787-88. As in the present case, in *Jacquith* we held that the statute of limitations began to run from the date that the plaintiff knew that her loss was caused by reliance upon the defendant's misinformation.

In *Bollam,* plaintiff insureds sued their insurer alleging that they incurred legal fees and excess liability through defendant insurer's negligent handling of a claim against them. We held that the plaintiffs' claim accrued when the defendant's conduct caused harm and resulted in damages to plaintiffs through the expenditure of legal fees to defend a claim against them. 302 Or at 347, 352-53. At this point there was no doubt as to the cause of the plaintiffs' harm, and as in the present case, we refused to delay the running of the statute until the extent of damages was discovered. 302 Or at 353.

The statute of limitations on a negligence claim, unlike deceit cases, is not suspended until the plaintiff knows or should know of the defendant's culpability. Nor is the statute suspended for purposes of allowing a plaintiff to develop facts to support or identify a theory of recovery or, as stated by the Court of Appeals, to learn "all of the facts which they might ultimately be able to advance to support their claim." 80 Or App at 608. Once the plaintiffs knew that they had a loss

resulting from their reliance upon the defendant's misinformation, they had to determine whether to sue or not within the statutory period, "which is precisely the same judgment that other tort claimants must make." *United States v. Kubrick,* 444 US 111, 124, 100 S Ct 352, 62 L Ed 2d 259 (1979). *Accord Davis v. United States,* 642 F2d 328, 331 (9th Cir 1981). Even if the plaintiffs made an initially incorrect determination why water was not available, there "is no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim" until the plaintiffs are otherwise informed or make a correct determination as to the existence of a claim. *See Kubrick,* 444 US at 124 (incompetent or mistaken advice as to the existence of claim does not toll statute). Accrual of a negligence claim does not await awareness of negligence. Accrual occurs with knowledge of the facts giving rise to the claim. The plaintiffs' claim was complete and their action could have been brought in early June 1978, more than two years before the date of the filing of the complaint. ORS 30.275(3) (1980).

## V

The plaintiffs' final argument, which is espoused by the dissent, is that they have separate claims for damages to the two farms and that there is no statute of limitations issue with respect to the Gun Club Farm. The plaintiffs argue that the claims for the Gun Club Farm accrued later than that for the Gregg Farm because the temporary source of water was not used for the Gun Club Farm and that water was not needed on that farm until July 1, 1980. We reject that argument. The plaintiffs had but one claim. That different parcels of property were involved, or that other parcels did not need water until a later time, did not result in either separate causes of action or a suspension of the statute of limitations as to parcels other than the Gregg Farm.

True, the plaintiffs pleaded them as two separate claims and the defendants never objected to them being pleaded as separate claims. Nevertheless, the claims that the plaintiff pleaded for the two farms are both based upon the defendant's negligent misrepresentations or failure to warn before the 1978 growing season. That is, the same tortious act or acts resulted first in damage to the Gregg Farm and then to the separate parcel of land known as the Gun Club Farm. A

claim arose from these acts or omissions when the plaintiffs incurred damages for alternate sources of water on the Gregg Farm, despite the fact that the full extent of damages from the defendants acts or omissions was not yet known, or that damages would result from the same cause on a separate parcel of land. The same act or acts may cause damage to more than one item of property at two distinct points in time. Simply splitting a claim or omitting a claim for damages to property occurring at an earlier point in time will not suffice to avoid the effect of the statute of limitations. To do so would be to mix "two discrete concepts, the occurrence of harm and the extent of damages." *See Jacquith v. Ferris, supra,* 297 Or at 788. Consistent with *Bollam v. Fireman's Fund Insurance Co.,* discussed above, we have consistently stated that "[i]t is immaterial that the extent of damages could not be determined at the time of the [tort]" for determining when the statute of limitation commenced to run. *Industrial Plating Co. v. North,* 175 Or 351, 354, 153 P2d 835 (1944) *quoted in Jacquith v. Ferris, supra,* 297 Or at 788.

The decision of the Court of Appeals is affirmed. The trial court is reversed.

**CAMPBELL, J.,** dissenting.

I dissent. The original complaint in this case was filed on June 18, 1980, and for the purposes of this dissent it is assumed that a two year statute of limitations applies and that Oregon recognizes the tort of negligent misrepresentation under Restatement (Second) Torts, § 552.

The plaintiffs' third amended complaint contains two causes of action and each cause contains two counts. This review concerns only the second count of each cause of action which alleges that the defendant acted in a negligent manner in one or more of the following particulars:

"(1) In representing to plaintiffs that irrigation water would be available for plaintiffs' crops for the 1978 growing season when defendant knew, or in the exercise of reasonable care, should have known that irrigation water would not be available.

"(2) In failing to warn plaintiffs that irrigation water for plaintiffs' crops might not be available."

The first cause alleges damages on the Gun Club farm

and the second cause alleges damages on the Gregg Farm. The two farms are more than one mile apart. The Gun Club farm is 39 acres in size and the Gregg Farm is 112 acres. The two farms are served by different branches of Unit Four of the defendant's irrigation system. On April 18, 1978, the defendant informed the plaintiffs by mail: "Pipeline users may expect to receive water service about June 1, 1978, with a minimum of interruption." At the trial there was testimony that the irrigation water was needed on the Gregg Farm on the first of June and on the Gun Club Farm on the first of July.[1]

As the majority points out, on May 28, 1978, a substantial leak or "blowout" occurred in the irrigation pipeline which served the Gregg Farm. By June 2nd the plaintiffs started pumping water from a neighbor's pond to irrigate the crops on the Gregg Farm. This involved an expenditure of costs for a pump, pipes and labor. Later the plaintiffs were required to pump water from a second neighbor's pond. None of the water pumped from the neighbors' ponds was used to irrigate the crops on the Gun Club Farm. It was not until the end of June that the plaintiffs plowed up one-half of the bean crop on Gun Club Farm and replanted it.[2]

The jury awarded the plaintiffs $17,273.74 on the first cause for damages to the Gun Club Farm and $59,255.78 on the second cause for damages to the Gregg Farm.

From the above summary of the pleadings and the facts this writer reaches two conclusions: (1) The two causes of action are separate and apart from each other and the harm complained of did not occur at the same time in both causes;

---

[1] Lloyd Duyck, one of the plaintiffs, testified:

"On Gun Club property we did not need water and had not asked for it and would not have needed it until approximately July 1. On the Gregg place we would like to have gotten water by around the 20th of May, if it were possible * * *. Definitely I had no reason to believe that it should not have been available approximately June 1 just like it was stated."

[2] The plaintiffs only sought to recover for crop damages. They did not seek to recover the cost of the pump and expenditures associated with it. Nor did they ask to be repaid for the cost of plowing up the bean crop. *See* Judge Newman's dissent in the Court of Appeals, *Duyck v. Tualatin Valley Irrigation Dist.*, 80 Or App 602, 609, 723 P2d 1043 (1986). Judge Newman's analysis of this case is correct. Instead of supporting Judge Newman in his losing cause, this writer has elected to show that the majority in this court is wrong in this particular case under its own theory of when the causes of action accrued.

and, (2) when the statute of limitations began to run in both causes are questions of fact and the case should be remanded to the trial court for retrial.[3]

In *Dowers Farms v. Lake County,* 288 Or 669, 680, 607 P2d 1316 (1980), we said:

> "There is no legislative history to tell us that the legislature intended the courts to apply different rules with respect to fixing the point in time when the limitations period commences to run in causes of action for damages for negligence under the Tort Claims Act than in such causes outside the Act. We had occasion to discuss in some detail the time from which the period of limitation should commence to run in such a cause in *U.S. Nat'l Bank v. Davies,* 274 Or 663, 666-668, 548 P2d 966 (1976) and concluded that 'in a negligence case the statute of limitations should never start to run until the occurrence of the harm.' 274 Or at 668. *We went on to hold that the harm occurred when the plaintiff was aware, or should have been aware, that the harm was caused by the defendant."* (Emphasis added; footnote omitted.)

There is a question of fact in this case as to when the plaintiffs were aware, or should have been aware, that the harm had occurred to the crops on the Gregg Farm because of the defendant's alleged negligent misrepresentations. The majority opinion in effect concedes that there is a question of fact. In 304 Or at 154, it is stated: "They [plaintiffs] may have incorrectly concluded that, but for the blowout, water would have arrived on June 1. * * *. By mid-June the plaintiffs believed that water would not be available for at least two additional weeks." Then the majority in 304 Or at 162 makes a leap that Carl Lewis, the long jumper, would be proud of by saying: "On June 1, 1978, the plaintiffs knew that reliance on defendants' representations regarding the availability of water was misplaced and had gotten them into a predicament in which they needed an alternative source of water."

Reasonable jurors could have drawn different inferences and reached different conclusions as to when the plaintiffs were aware, or should have been aware, that the defendants' negligent misrepresentation was causing damage to the plaintiffs' crop on the Gregg Farm. While in the normal

---

[3] As the majority points out, the trial court refused to present the statute of limitations question to the jury.

course of events, such knowledge might have been gained by the plaintiff by June 1, 1978, because that was when water was needed and unavailable, the "blowout" masked the defendant's responsibility in this case until later.

Likewise, reasonable jurors could have drawn different inferences and reached different conclusions as to when the harm first occurred on the Gun Club farm. If the majority is holding that the expense of obtaining an alternate supply of water triggered the running of the statute on the Gregg Farm, then it should follow that the statute was triggered on the Gun Club farm by the first expense of plowing up one-half of the bean crop. A reasonable jury could reach a conclusion that the act occurred after June 18, 1978.

For these reasons both causes should be remanded to the trial court for retrial on proper instructions as the running of the statute of limitations.