34 F.3d 1071
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
CASH FLOW INVESTORS, INCORPORATED, Plaintiff-Appellant/Cross-Appellee,
v.
UNION OIL COMPANY OF CALIFORNIA, A California corporation,
dba Unocal, Defendant-Appellee/Cross-Appellant.
 Nos. 93-35157, 93-35206.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 1994.
Decided Aug. 12, 1994.
 
 1
 Before: TANG and WIGGINS, Circuit Judges, and HENDERSON*, District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Cash Flow Investors, Inc. ("Cash Flow"), the owner of a previous gas station site, sought contribution under Oregon's Hazardous Waste Act, O.R.S. Secs. 465.200 et seq., from Union Oil Company of American (dba "Unocal") for costs associated with the clean-up of environmental contamination from an underground gasoline storage tank. Cash Flow appeals the amount of contribution awarded by the district court, and Unocal cross-appeals the district court's award of prejudgment interest. We affirm in part and reverse in part.
 
 DISCUSSION
 
 4
 I. What were the reasonable "remedial action costs" incurred by Cash Flow?
 
 
 5
 The Oregon Hazardous Waste Act makes owners or operators of facilities which cause environmental contamination strictly liable for "remedial action costs incurred by the state or any other person." See O.R.S. Sec. 465.255(1). "Remedial action costs" are defined as the "reasonable costs which are attributable to or associated with a removal or remedial action at a facility, including but not limited to the costs of administration, investigation, legal or enforcement activities, contracts and health studies." O.R.S. Sec. 465.200(16).
 
 
 6
 Cash Flow maintains that it incurred a total of $414,042.50 in clean-up costs, only $107,720.00 of which was awarded by the district court (which was then reduced by 25% to allocate Cash Flow's share of the clean-up costs). Cash Flow argues that the district court clearly erred in reducing the requested contribution for two reasons: (1) the district court should have awarded the costs of aerating the contaminated soil rather than landfill disposal, and (2) the court erred in computing the size of the excavation.
 
 
 7
 The district court's findings of fact are reviewed for clear error, Fed.R.Civ.P. 52(a), and must be accepted unless this court is left with the definite and firm conviction that a mistake has been made. See Concrete Pipe & Prod. v. Const. Laborers Pension Trust, --- U.S. ----, 113 S.Ct. 2264, 2279-80 (1993). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Service Employees Int'l Union v. Fair Political Practices Comm'n, 955 F.2d 1312, 1317 n. 7 (9th Cir.) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985)), cert. denied, 112 S.Ct. 3056 (1992).
 
 A.
 
 8
 Rather than awarding the reasonable costs of aerating the soil, the district court awarded a much lower amount for disposal at St. Johns landfill. Cash Flow argues that the district court was clearly erroneous in concluding that landfill disposal was a "reasonable remediation method" because it was environmentally unsound. The testimonial evidence, however, was sufficient to conclude that gasoline-contaminated soil was accepted at St. Johns landfill at that time. [See Tr. II at 42 (Ken Meisel) (St. Johns and Hillsboro landfills accepted contaminated soils); Tr. II at 200 (Loren Garner) (could haul contaminated soil to a landfill).]
 
 
 9
 More persuasively, Cash Flow argues that it was erroneous to require landfill disposal (versus aeration) because Cash Flow may have retained future liability for clean-up of the landfill. All of the witnesses asked agreed that Cash Flow could incur future clean-up costs by disposing of the contaminated soil in a landfill. [See Tr. II at 40 (Meisel); Tr. II at 67 (Lewis West); Tr. II at 156 (Scott Widness); Tr. II at 200 (Garner).] This future liability is relevant to the determination of a reasonable remediation method.
 
 
 10
 Moreover, the statute favors permanent solutions: remedial action is that "consistent with a permanent remedial action taken instead of or in addition to removal actions in the event of a release or a threatened release of a hazardous substance into the environment, to prevent or minimize the release of a hazardous substance so that it does not migrate to cause substantial damage to present or future public health, safety, welfare or the environment." O.R.S. Sec. 465.200(15) (emphasis added). Further, under Sec. 465.315(1)(a), any removal or remedial action "shall attain a degree of cleanup of the hazardous substance and control of further release of the hazardous substance that assures protection of present and future public health, safety, welfare, and of the environment." If the director of DEQ orders a removal or remedial action, he or she must select "a remedial action that is protective of human health and the environment, that is cost effective, and that uses permanent solutions." Sec. 465.315(1)(b) (emphasis added). Given that the statute encourages permanent clean-up, it would be inequitable to refuse to award Cash Flow's reasonable costs in attempting to comply with the statute.
 
 
 11
 Indeed, the district court recognized that "aeration is the most desirable form of remediation if it can be done properly." [ER 3 at 19.] The court simply felt that the method of aeration employed was not reasonable because the soil was treated in a high pile, and it believed proper aeration requires the soil to be spread out in an 8-12 inch layer. The district court's conclusion that aeration of a pile was improper is not supported by the evidence.[1] Unocal's geological engineering expert testified that aeration was possible on the site used, but that only 8-12 inches could be treated at one time. [Tr. II at 158 (Widness).] In fact, this witness stated that he would have chosen aeration on-site, and that it may have been cheaper in the long run to aerate the soil, given the long-term liability in disposing of the soil in a landfill. [Id. at 171-72.] This witness did emphasize, however, that the costs of aerating a pile of soil would be more than the $20 per cubic yard it would cost to aerate spread-out soil. [Id. at 172-73.]
 
 
 12
 In sum, the district court clearly erred by refusing to award the reasonable costs of treating the soil by aeration, versus landfill disposal. The testimony did indicate, however, that the costs of aeration were high because of the method chosen. We remand the case for reconsideration of the reasonable costs involved in aerating the contaminated soil.
 
 B.
 
 13
 Cash Flow next argues that the district court clearly erred by determining that the excavation was 30 X 50 feet and 15 X 20 feet across, and only 15 feet deep. These measurements yielded an excavation of 1,170 cubic yards, and a backfill of 1,300 cubic yards.
 
 
 14
 The district court's finding regarding the horizontal measurements of the excavation was plausible given the conflicting evidence on this point. [See Ex. 139; Tr. I at 221 (Bill Ogilvie) (asphalt patches were 58 X 38 and 20 X 20); Tr. II at 51 (West) (area was approximately 30 X 50 and 15 X 20); Tr. II at 163 (Widness) (area was a rough 60 X 65 triangle).]
 
 
 15
 The district court's finding that the excavation was 15 feet deep was also plausible in light of conflicting testimony and evidence. While Cooper testified that the hole was 24-25 feet deep, [Tr. I at 170], the letter Cooper had written to DEQ stated that he had taken soil samples from the hole at a depth of 15 feet. [SER at 29-30.] Although Cash Flow attempts to reconcile this inconsistency on appeal, the evidence at trial did not clarify whether soil samples were taken at various stages in the project, or only once at a depth of 15 feet. [See Tr. I at 195 (Cooper) (explaining that he took samples "before the cleanup was completely done"), and Tr. I at 196 (when asked how many samples taken at the bottom of the hole, explained took a sample out of each corner of the excavation "after the contaminated soil had been removed"); but see Tr. I at 203 (doesn't remember if took samples periodically or just once).] The letter to DEQ is not clear when the sample was taken: it was written on September 17, 1990, well after the excavation to remove contaminated soil was finished, yet it referred to only one sample.
 
 
 16
 More significantly, other evidence contradicts Cooper's testimony regarding the amount of soil removed (and thus, the size of the excavation). Cooper testified at trial that he knew the amount of soil excavated because he counted 100 trips with his truck and he knew the exact capacity of his truck. [Tr. I at 172-73.] In contrast, Garner testified that on January 3, 1989, Cooper told Garner that he had taken 20-30 truckloads of contaminated soil to the aeration site. [SER 31 (phone log report).] Cooper told Garner on January 6, 1989, after the excavation was complete, that approximately 600 cubic yards of soil had been removed. [Tr. II at 196-97; SER 28.] Cash Flow failed to produce any documentary evidence to verify the amount of soil removed.
 
 
 17
 Finally, expert witnesses agreed that due to the consistency of the soil (silty clay) and the level of the water table, the gasoline contamination was more likely to travel horizontally than vertically. [Tr. II at 24-25 (Meisel); Tr. II at 166 (Widness).] The tanks were set at a bottom depth of 12 feet.
 
 
 18
 The district court's findings regarding the amount of soil excavated were not clearly erroneous.
 
 
 19
 II. Wash Cash Flow an "owner or operator"?
 
 
 20
 An "owner or operator" is defined in the statute as any person who owned, leased, operated, controlled or exercised "significant control over a facility." See O.R.S. Sec. 465.200(12). A "facility" includes an underground storage tank where a hazardous substance has been stored. See Sec. 465.200(6). The parties agree that Unocal was an "owner or operator" of the storage tanks at least until April 30, 1985 when the lease expired.[2]
 
 
 21
 The parties dispute, however, whether Unocal was still the owner of the storage tanks after the expiration of the lease. Cash Flow argues that it was not the owner of the storage tanks because legal title to the tanks remained with Unocal upon expiration of the lease because a bill of sale was not executed nor was consideration paid. Cash Flow fails to cite any authority supporting its position.
 
 
 22
 We agree with the district court that ownership passed to Cash Flow because it had two options upon expiration of the lease: accept the transfer of the property, or submit a written request for Unocal to remove the improvements and storage tanks. The plaintiff failed to request the removal of the tanks and asserted ownership over the tanks by continuing to operate the gas station.
 
 
 23
 Moreover, it clear that Cash Flow was at least an "operator" under the statute after the expiration of the lease: at that point it (or its assignors) exercised complete control over the operation of the storage tanks. The district court's conclusion that Cash Flow was an "owner or operator" is not erroneous.
 
 
 24
 Cash Flow also challenges the district court's apportionment of 25% liability to Cash Flow. Under the Oregon statute, a court "may allocate remedial action costs among liable parties using such equitable factors as the court determines are appropriate." O.R.S. Sec. 465.325(6)(a). Cash Flow bears some responsibility for the contamination: Nichols continued to sell gasoline from the tank he knew or suspected was leaking and attempted to cover up the problem when it was revealed by Mascott in 1986. The statute clearly places the equitable apportionment within the discretion of the district court; the court's decision to apportion 25% liability to Cash Flow was not an abuse of that discretion.
 
 
 25
 III. Is Cash Flow entitled to prejudgment interest?
 
 
 26
 Because the Oregon Hazardous Waste Act does not provide for the recovery of prejudgment interest, the district court correctly applied the Oregon common law rule that prejudgment interest is allowed "where the exact amount owed is ascertainable by simple computation or by reference to generally recognized standards and where the time from which interest must run can be ascertained." Trienco, Inc. v. Applied Theory, Inc., 794 P.2d 1239, 1243 (Or.App.1990). The allowance of interest in an equitable action is a matter of discretion. Jarrett v. United States Nat'l Bank, 768 P.2d 936, 938 (Or.App.1989).
 
 
 27
 The dispute regarding the allocation of liability between Unocal and Cash Flow is not sufficient to bar an award of prejudgment interest. See School District v. Mission Ins. Co., 650 P.2d 929, 943 (Or.App.1982) (the "allocation of damages between the two primary insurers.... does not defeat a claim for prejudgment interest"), rev' denied, 662 P.2d 725 (1983).
 
 
 28
 The district court did not abuse its discretion by awarding prejudgment interest for the geotechnical services provided by OEM Industries, the amount of which was not disputed by Unocal and was ascertainable from the date plaintiff was billed for the services. Because Unocal also did not challenge the amount charged for the removal of the storage tanks ($17,300), and that amount was ascertainable from the billing date, the district court abused its discretion by failing to award prejudgment interest on this amount.
 
 
 29
 On the other hand, we agree with the district court that amounts owing for excavation and trucking, backfill, and dumping or treatment of the soil were not "previously ascertainable." Every element of the remediation process was in dispute: the amount of soil removed (and backfilled), the price charged for those services, and the remedial process chosen. In order to determine these issues, the district court had to weigh conflicting evidence and expert opinion. The district court did not abuse its discretion by refusing to award prejudgment interest on these elements of the claim. Only the denial of prejudgment interest on charges for tank removal was an abuse of discretion, and will be remanded for recalculation.
 
 IV. The state law waste claim
 
 30
 The district court held that Nichols discovered the leak (and hence, the basis for the waste claim) at least by October 17, 1985, on which date Nichols sent a letter to William Knight of Unocal stating that Unocal representatives were aware of leaking gas tanks prior to the lease expiration, that Nichols had had complaints from neighbors about gas smell in the sewers, and that Nichols was "exposed to clean-up fees" as a result of leaking gas tanks. [See SER 22-27.] The district court granted summary judgment to Unocal for Cash Flow's failure to file within six years of the date of this letter. See O.R.S. Sec. 12.080(3) (six year statute of limitations).
 
 
 31
 A grant of summary judgment is reviewed de novo. Jones v. Union Pacific R.R., 968 F.2d 937, 940 (9th Cir.1992). The panel must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Gizoni v. Southwest Marine, Inc., 909 F.2d 385, 387 (9th Cir.1990), aff'd, 112 S.Ct. 486 (1991).
 
 
 32
 Cash Flow first claims that there was a genuine issue of fact when Nichols discovered the gasoline leak. Cash Flow contends that Nichols did not discover the leak until June 16, 1986, when the gasoline pool was uncovered during the excavation for a third underground storage tank, although Nichols suspected the existence of a leak before then. The language of the letter, however, belies Cash Flow's contention: it clearly shows that Nichols knew (or thought) there was a leak.
 
 
 33
 The fact that Nichols may not have been aware of the extent of the gasoline leak prior to the excavation does not toll the statute of limitations. Awareness of the full extent of harm is not necessary for a cause of action to accrue. Raethke v. Oregon Health Sciences Univ., 837 P.2d 977, 979 (Or.App.1992), rev' denied, 847 P.2d 410 (1993). A statute of limitations is not "suspended for purposes of allowing a plaintiff to develop facts to support or identify a theory of recovery or ... to learn 'all of the facts which they might ultimately be able to advance to support their claim.' " Duyck v. Tualatin Valley Irrigation Dist., 742 P.2d 1176, 1183 (Or.1987). Once a plaintiff is aware he has been harmed, he must "determine whether to sue or not within the statutory period, 'which is precisely the same judgment that other tort claimants must make.' " Id. (quotation omitted).
 
 
 34
 Cash Flow is incorrect that the district court imposed a requirement that Cash Flow identify the precise point at which the storage tanks began leaking. The district court held that the statute of limitations for waste began to run when Nichols knew about the leak, not when the leak began.
 
 
 35
 We also reject Cash Flow's argument that the statute of limitations began to run when it sustained clean-up costs. The injury for which Cash Flow sued Unocal in its waste claim is the damage to the property--the gasoline leak, not the clean-up costs, is the injury. A "cause of action accrues when the party owning it has a right to sue on it." Id. at 1181. Cash Flow had a right to sue for waste when Nichols knew the storage tank was leaking.[3]
 
 
 36
 However, we agree with Cash Flow that Unocal is judicially estopped from arguing that Nichols had knowledge of the leak.[4] "[J]udicial estoppel precludes a party from assuming a position in a legal proceeding inconsistent with the position previously asserted." Caplener v. United States Nat'l Bank, 857 P.2d 830, 837 (Or.1993), citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3rd Cir.), cert. denied, 488 U.S. 967 (1988). Throughout the litigation Unocal took the position that there was no evidence that gasoline had escaped from the tank during its period of ownership. In arguing to dismiss the waste claim, however, Unocal argued that Nichols knew during this same time period that the tanks had leaked. These positions were inconsistent.
 
 
 37
 Moreover, Unocal's inconsistent position was adopted by the district court. See Couch v. Scandinavian-American Bank, 103 Or. 48, 57, 197 P. 284 (Or.1922) (A party who has "assumed a particular position in judicial proceedings, and has succeeded in maintaining that position, is estopped to assume a position inconsistent therewith to the prejudice of the adverse party") (citation omitted); Stevens Technical Services, Inc. v. SS Brooklyn, 885 F.2d 585, 589 (9th Cir.1989) (most circuits refuse to apply judicial estoppel unless the inconsistent positions are adopted by the court). In the same order granting Unocal's motion for summary judgment on the waste claim because Nichols knew about the leak by October 17, 1985, the district court denied Cash Flow's motion for partial summary judgment on the contribution claim, holding that "a fact issue remained as to whether the acts or omissions that resulted in the leak occurred while defendant was the undisputed owner of the facility." [ER 1 at 3.] In essence, the district court held that there was a material fact at issue about when the leak occurred (i.e. whether the leak occurred prior to April 30, 1985), but not a material fact that the plaintiff knew about the leak as early as October 17, 1985.
 
 
 38
 We hold that Unocal is judicially estopped from arguing that Nichols knew about the leak prior to the excavation in which the pool of gasoline was found. We thus reverse the district court's grant of summary judgment on statute of limitations grounds, and remand this claim for further proceedings.
 
 
 39
 V. The state law claim for breach of an oral promise
 
 
 40
 Cash Flow alleges that in June 1986 when the pool of gasoline was discovered, William Knight from Unocal promised on behalf of Unocal to clean up the contamination. The district court granted summary judgment to Unocal, holding that, even if made, the statement might have been in reference to a perceived obligation incurred under the original lease, and was thus barred by the statute of limitations. See O.R.S. Sec. 12.080 (statute of limitations for breach of contract). This conclusion is not challenged by Cash Flow on appeal.
 
 
 41
 Alternatively, the district court held that it was an independent promise which failed for lack of consideration, or was barred under the statute of frauds. Cash Flow maintains that the consideration was plaintiff's promise to forebear suing Unocal in exchange for Unocal's promise to remediate the problem. However, Cash Flow did not demonstrate a genuine issue of material fact that it had indeed bargained with Unocal on this point, and we affirm the grant of summary judgment.
 
 
 42
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS DISPOSITION. EACH PARTY TO BEAR ITS OWN COSTS ON APPEAL.
 
 
 
 *
 Honorable Thelton E. Henderson, Chief United States District Judge for the Northern District of California, sitting by
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The district court's conclusions that the proper equipment was not used to aerate the pile, and that Nichols' and Cooper's testimony was vague regarding the size of the lot, go to the reasonable costs of aeration, not whether aeration was a reasonable remedial action
 
 
 [2]
 Unocal does not challenge on appeal the district court's conclusion that gasoline contamination occurred during its period of ownership
 
 
 [3]
 For the same reason, we reject Cash Flow's argument that its continuing clean-up expenses constitute a continuing injury which tolls the statute of limitations. There is no continuing environmental contamination caused by the storage tanks for which Cash Flow will be liable
 
 
 [4]
 We reject Cash Flow's equitable estoppel argument, however, because Cash Flow has not demonstrated the elements of this claim. See Welch v. Washington County, 842 P.2d 793, 798 (Or.1992) (equitable estoppel requires (1) a false representation made with knowledge of the facts to a party ignorant of the truth; (2) made with the intention that it should be acted upon by the other party; and (3) the other party acted upon it) (quotations omitted)